Rolf LARSEN, Plaintiff,

v.

SENATE OF THE COMMONWEALTH
OF PENNSYLVANIA, et al.,
Defendants.

Civil Action No. 1:CV–95–1540.

United States District Court,
M.D. Pennsylvania.

Feb. 28, 1997.

Cletus P. Lyman, Lyman & Ash, Philadelphia, PA, Michael Steven Fettner, Philadelphia, PA, for Rolf Larsen.

Arlin M. Adams, Schnader, Harrison, Segal and Lewis, Philadelphia, PA, Morey M. Myers, Myers, Brier & Kelly, Scranton, PA, Michael J. Barry, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for Senate of the Commonwealth of Pennsylvania, Roy C. Afflerbach, Anthony B. Andrezeski, Gibson E. Armstrong, Earl Baker, Albert V. Belan, Clarence D. Bell, Leonard J. Bodack, Individual Senators.

Morey M. Myers, Myers, Brier & Kelly, Scranton, PA, for Michael E. Bortner.

Arlin M. Adams, Schnader, Harrison, Segal and Lewis, Philadelphia, PA, Morey M. Myers, Myers, Brier & Kelly, Scranton, PA, Michael J. Barry, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for David J. Brightbill, J. Doyle Corman, Michael M. Dawida, Michael B. Fisher, Vincent J. Fumo, Stewart J. Greenleaf, Melissa A. Hart, David W. Heckler, Edward W. Helfrick, Edwin G. Holl, Roxanne H. Jones, Robert C. Jubelirer, Gerald J. LaValle, Charles D. Lemmond, Jr., H. Craig Lewis, J. William Lincoln, F. Joseph Loeper, Roger A. Madigan, Bruce S. Marks, Robert J. Mellow, Harold F. Mowery, Jr., Raphael J. Musto, Michael A. O'Pake, Frank A. Pecora, John E. Peterson, Eugene E. Porterfield, Terry L. Punt, Jeanette F. Reibman, James J. Rhoades, Robert D. Robbins, Frank A. Salvatore, Allyson Y. Schwartz, Tim Shaffer, John J. Shumaker, Patrick J. Stapleton, William J. Stewart, J. Barry Stout, Richard A. Tilghman, Jack Wagner, Noah W. Wenger, Hardy Williams.

Arlin M. Adams, Michael J. Barry, Schnader, Harrison, Segal and Lewis, Philadelphia, PA, for Supreme Court of Pennsylvania, Robert Nix, John Flaherty, Stephen Zappala, Nicholas Papadakos, Ralph Cappy, Frank Montemuro, Ronald Castille.

James J. Kutz, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA, LeRoy S. Zimmerman, Eckert Seamans Cherin & Mellott, Harrisburg, PA, for Joseph F. McCloskey, William F. Burns, Dawson R. Muth, Peter DePaul, Carol K. McGinley, Christine L. Donohue, Justin M. Johnson, William Cassenbaum, for Judicial Conduct Board.

W. Thomas McGough, Jr., Reed Smith Shaw & McClay, Pittsburgh, PA, Pamina G. Ewing, Reed Smith Shaw & McClay, Pittsburgh, PA, for Joseph A. Del Sole.

Pamina G. Ewing, Reed Smith Shaw & McClay, Pittsburgh, PA, for Arthur J. Edmunds.

W. Thomas McGough, Jr., Pamina G. Ewing, Reed Smith Shaw & McClay, Pittsburgh, PA, for Diane M. Edmundson, Gerard P. Egan, John W. Herron, Frederick Wells Hill, Matthew Anita MacDonald, Gerald J. O'Connor, Andrew Palm, Charles W. Rubendall, II, James E. Russo, Bernard C. Watson, William J. Arbuckle, III, Bruce A. Antkowials, Thomas A. Bergstrom.

Arthur G. Raynes, Raynes, McCarty, Binder, Ross & Mundy, Philadelphia, PA, for Administrative Office of Pennsylvania Courts, Nancy M. Sobolevtich, David A. Frankforter.

### MEMORANDUM

RAMBO, Chief Judge.

## I. *Introduction*

Before the court is a plethora of motions. There are four separate motions to dismiss filed on behalf of: (1) Defendants Senate of Pennsylvania and the individual Senators, (2)

Defendants Judicial Conduct Board ("JCB") and individual Judicial Conduct Board members, (3) Defendants Court of Judicial Discipline ("CJD") and its individual members, (4) Defendants Supreme Court of Pennsylvania and the individual justices thereof, and (5) Defendants Administrative Office of the Pennsylvania Courts, Nancy Sobolevitch, and David Frankforter. In addition, also pending before the court are the Senate Defendants' motion for costs pursuant to Federal Rule of Civil Procedure 41(d) and to strike portions of the amended complaint and the JCB Defendants' motion for sanctions under Rule 11. Furthermore, on July 15, 1996, Plaintiff Larsen filed a motion for partial summary judgment. In light of Defendants' pending motions, on July 29, 1996, the court stayed briefing on Plaintiff's motion. This memorandum and accompanying order will dispose of all motions presently pending before the court except for Larsen's motion for partial summary judgment.

## II. *Procedural and Factual History*

Plaintiff Larsen is a former Justice of the Pennsylvania Supreme Court. Larsen was initially elected to the Supreme Court for a ten-year term commencing in January 1978. He was reelected for a second term beginning in 1988. This case arises out of Larsen's removal from office in October 1993 based on allegations that he engaged in criminal activity. Larsen was removed from office by order of the Pennsylvania Supreme Court on October 28, 1993, convicted on April 9, 1994 on two counts of criminal conspiracy under the Controlled Substances Act, impeached by the Senate on October 4, 1994, and removed from his position by the CJD on June 3, 1994. In this action, Larsen sues virtually every entity and individual which played a role in his removal from office. He claims, generally, various due process, First Amendment, and equal protection violations in the removal procedures afforded him. Larsen alleges the following facts in support of his claims.

In or around 1988, the Judicial Inquiry and Review Board ("JIRB") charged Larsen with several violations of Article 5, Section 17(b)

of the Pennsylvania Constitution.[1] Section 17(b) provides that "[j]ustices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court." Pa. Const. art. 5, § 17(b). The JIRB investigated Larsen and on July 17, 1991 issued a report to the Supreme Court of Pennsylvania in which it found that Larsen, acting without improper motive, had created an appearance of impropriety by meeting ex parte with a trial judge presiding over a case pending in the Allegheny County Court of Common Pleas. The JIRB recommended that Larsen be publicly reprimanded. *In re Larsen*, 532 Pa. 326, 616 A.2d 529 (1992). On October 14, 1992, the Supreme Court by Justices Zappala and Cappy, with Justice Papadakos dissenting, issued an order per curiam without opinion adopting the JIRB's report and recommendation. *Id.*

On November 24, 1992, Larsen served a petition for the disqualification and recusal of Justices Zappala and Cappy. Larsen served a "supplemental" petition on December 14, 1992, and a second "supplemental" petition on January 7, 1993. In his petitions, Larsen raised issues of partiality and improper motivation on the part of Justices Zappala and Cappy during the JIRB's investigation of him and in deciding to adopt the JIRB's report and recommendation. Larsen requested that Justices Zappala and Cappy recuse themselves or, in the alternative, that they be disqualified from considering the JIRB's report and recommendation. Larsen also accused Chief Justice Nix of acting improperly by interfering in a pending trial in Lehigh County, and interfering in the defendant's petition for allowance of appeal in that case.

In response to Larsen's allegations, former attorney general Earnest Preate, Jr. appointed two special counsels to investigate Larsen's claims. Over the course of 1993, a grand jury heard testimony regarding Larsen's allegations as well as the JIRB's accusations against Larsen. The grand jury ultimately found two areas of alleged misconduct by Larsen: (1) that he systematically main-

---

1. The JIRB is the predecessor of the JCB.

tained a list of petitions for allowance of appeal to be given special handling by his staff, and (2) that he regularly obtained prescription medications for his own use by causing a physician to issue prescriptions in the names of members of his staff.

On October 22, 1993, the grand jury recommended that criminal charges be brought against Larsen for his procurement of prescription drugs in the name of his staff members. On October 28, 1993, Larsen was charged with criminal conspiracy and multiple violations of the Controlled Substances Act. That same day, the Pennsylvania Supreme Court relieved Larsen "of any and all judicial and administrative responsibilities as a justice." (Defs.' Ex. B.) Larsen continued to receive his salary.

In January 1993, while the grand jury was deliberating, Representative Christopher K. McNally filed a petition in the Pennsylvania House of Representatives calling for Larsen's impeachment based on alleged violations of the Code of Judicial Conduct. On November 5, 1993, the grand jury's report was made public. The grand jury report formed the basis for the Pennsylvania House of Representative's and the JCB's investigation of Larsen. The House Judiciary Committee requested and obtained copies of the transcripts of witnesses' testimony and exhibits presented to the grand jury. On November 23, 1993, the House adopted House Resolution No. 205 authorizing the House Judiciary Committee to investigate Larsen's conduct. The House Judiciary Subcommittee on Courts held public hearings in con-

junction with its investigation into the allegations against Larsen.

On April 9, 1994, after a five day trial in the Allegheny Court of Common Pleas, a jury convicted Larsen of two counts of criminal conspiracy under the Controlled Substances Act. Thereafter, on April 22, 1994, the House Subcommittee voted to recommend to the entire House a resolution to impeach Larsen. On May 18, 1994, House Resolution 324 was introduced listing seven articles of impeachment against Larsen and on May 24, 1994 the House adopted Resolution 324.[2]

On June 6, 1994, the Senate received the articles of impeachment from the House Managers and pursuant to Article 10 of the Senate Rules of Practice and Procedure for impeachment trials, appointed a committee of six senators ("the Senate committee") to conduct evidentiary hearings regarding the allegations against Larsen.[3] Senator Robert Jubelirer, President Pro Tempore of the Senate, appointed Senators Stewart Greenleaf, Charles Lemmond, H. Craig Lewis, Jeannette Reibman, Tim Shaffer, and Hardy Williams to the committee. On June 20, 1994, Larsen filed an answer with new matter to the articles of impeachment. On June 30, 1994, Larsen filed an omnibus pretrial motion with the Senate, requesting that the Senate dismiss the action of the Senate committee and that his impeachment trial be held before the full Senate. Larsen also moved for a pretrial hearing before the full Senate, discovery, the recusal of certain Sen-

---

**2.** The articles of impeachment accused Larsen, generally, of "misbehavior in office." Specifically, the articles of impeachment charged Larsen with: (1) tracking petitions for allowance of appeal to the Supreme Court of Pennsylvania so that these petitions could be specially handled by members of his staff—these petitions received special treatment because counsel of record were friends of and made political contributions to Larsen; (2) communicating ex parte with an attorney who was a friend and political supporter of Larsen in cases in which he had petitions for allowance of appeal pending before the Supreme Court and voting consistent with the positions being advocated by that attorney; (3) lying before the grand jury that was investigating him; (4) communicating with an Allegheny County Court of Common Pleas judge regarding a civil case before that judge and providing extra-record

information to that judge potentially beneficial to a litigant in that matter represented by a friend of Larsen's; (5) making bad faith allegations with a reckless disregard for the truth against Justices Zappala and Cappy in his petition and supplemental petitions for their disqualification and recusal; (6) obtaining prescription drugs in the name of his staff for his own use; and (7) undermining confidence in the integrity and impartiality of the judiciary and betraying the trust of the people of Pennsylvania. (Defs.' Ex. G.)

**3.** Pursuant to the Pennsylvania Constitution, the House of Representatives possesses exclusive authority to impeach. Pa. Const. art. 6, § 4. The constitution further provides that "[a]ll impeachments shall be tried by the Senate." Pa. Const. art. 6, § 5.

ators, a continuance, and the payment of attorney's fees and costs.

On August 8, 1994, the Senate committee commenced evidentiary hearings on the articles of impeachment. The committee concluded hearings on September 9, 1994. On September 20, 1994, the full Senate heard oral argument on Larsen's pretrial motions and subsequently voted without debate to deny all of his motions.

On September 27, 1994, the full Senate convened and heard closing arguments by the House Managers and Larsen's counsel. Simultaneously, the Senate committee for the first time provided the individual Senators and Larsen's counsel with a copy of its final report. The report contained a summary of evidence presented at the hearings.

On October 4, 1994, the Senate voted on the seven articles of impeachment. The Senate voted forty-four to five to convict Larsen on article II. Article II charged Larsen with engaging in an ex parte communication with an attorney who was a friend and political supporter of his regarding two petitions for allowance of appeal the attorney had pending before the Pennsylvania Supreme Court. At Larsen's request, the attorney indicated the position he was advocating in each case. Larsen ultimately voted in accordance with the attorney's stated positions. The Senate voted to acquit Larsen on the other six articles. The Senate then voted unanimously to bar Larsen from holding any office of trust or profit in Pennsylvania in the future.

At the same time the House and Senate were proceeding against Larsen, the JCB was also investigating the allegations against him. The JCB is a twelve member board formed pursuant to Article 5, Section 18 of the Pennsylvania Constitution to investigate allegations of judicial misconduct. Pa. Const. Art. 5, § 18. In appropriate circumstances, the JCB may file a formal complaint with the CJD. The CJD is an eight member state administrative tribunal formed pursuant to Article 5, Section 18(b) of the Pennsylvania Constitution to hear and determine charges of judicial misconduct. In January 1994, the JCB wrote Larsen and notified him that it was instituting an investigation into all of his activities as a Supreme Court Justice. On March 10, 1994, JCB filed an application with the CJD for an interim order directing the suspension of Larsen with pay, on the basis that Larsen had been charged with a felony in the Allegheny Court of Common Pleas. The JCB requested that if and when Larsen was convicted, that his suspension be automatically converted to a suspension without pay.

On or about March 20, 1994, Larsen filed an answer with new matter to the JCB's application. On March 25, 1994, the CJD denied the JCB's application.

On April 9, 1994, an Allegheny Court of Common Pleas jury convicted Larsen on two felony counts. On April 18, 1994, the JCB filed a second application to suspend Larsen without pay. In support of its application, the JCB averred Larsen's conviction on criminal charges in the Allegheny Court of Common Pleas. Larsen had yet to be sentenced and had appealed his convictions. On May 5, 1994, Larsen filed an answer and new matter to the JCB's application. On May 16, 1994, the JCB filed a response to new matter. The CJD conducted a hearing on the JCB's second application on May 25, 1994. Exhibits regarding Larsen's criminal information and jury verdicts were admitted into evidence. Larsen's counsel moved to bifurcate the hearing to permit him to introduce testimony at a later date. The CJD denied the motion. On June 3, 1994, the CJD granted the JCB's application for an interim order suspending Larsen without pay. Thereafter, on June 6, 1994, the JCB filed a formal complaint against Larsen with the CJD.[4]

---

4. The amended complaint is unclear in delineating the charges against Larsen raised in the JCB's formal complaint. Paragraph ninety of the amended complaint asserts that "[o]n June 6, 1994, the JCB filed with the CJD, "Board Complaint—Formal Charges" against Justice Larsen, alleging, among other things, matters alleged in his petitions for the disqualification and recusal of Justice Zappala and Justice Cappy." (Am. Compl. ¶ 90.) Since Larsen's petitions for the disqualification of Justices Zappala and Cappy contained allegations against them and not against Larsen, the court presumes Larsen to allege that the JCB complaint charged him with making false statements in his petitions for disqualification and recusal.

Larsen instituted the present action on September 13, 1995. In response, all Defendants filed motions to dismiss, arguing various reasons why the complaint should be dismissed. On February 26, 1996, Plaintiff filed an amended complaint, thereby mooting Defendants' pending motions. Defendants again moved to dismiss the amended complaint in its entirety, alleging various procedural and substantive irregularities.

Larsen's claims against the various Defendants are too numerous to recite herein and will be discussed as necessary in the context of addressing the merits of Defendants' individual motions. Generally, Larsen alleges that in each of the proceedings which resulted in his removal from judicial office, Defendants violated his rights to due process and equal protection, and retaliated against him in violation of the First Amendment based on his statements in his petitions for the disqualification and recusal of Justices Zappala and Cappy, and his statements regarding Chief Justice Nix. Larsen seeks reinstatement, compensatory damages, monetary damages, and resumption of his medical insurance benefits.

### III. *Discussion*

#### A. Law Governing Motions to Dismiss

In addressing Defendants' motions, the court is required to accept as true all of the factual allegations in the amended complaint and all reasonable inferences that can be drawn from its face. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *White v. Napoleon*, 897 F.2d 103, 106 (3d Cir.1990). "The complaint will be deemed to have alleged sufficient facts if it adequately put[s] the defendants on notice of the essential elements of ... plaintiff['s] cause of action." *Nami*, 82 F.3d at 65. The court will not dismiss the amended complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief." *Conley v. Gibson*, 355 U.S.

41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■ At the outset of its discussion, the court notes that several Defendants argue that Larsen's claims against them are moot in that he seeks reinstatement to the bench, a remedy which the court cannot provide as Larsen was removed from office as part of his sentence imposed by the Allegheny Court of Common Pleas following his trial. While this is true, the court notes that Larsen has appealed his criminal conviction and sentence, challenging his removal from office. On August 5, 1996, while the current motions were pending before this court, the superior court declined to entertain Larsen's challenge on appeal to his removal from office, holding that the issue was moot due to the Senate's impeachment of him. *Commonwealth v. Larsen*, 452 Pa.Super. 508, 682 A.2d 783, 793–94 (1996). Because the possibility remains that the Supreme Court of Pennsylvania will hold differently and address the merits of Larsen's challenge to his sentence, the court does not find it appropriate to dismiss Larsen's claims at this time based on mootness.[5]

The court will address Defendants' arguments in support of dismissal *seriatim.*

#### B. Rooker–Feldman

■ The Senate and individual Senate Defendants argue that the court lacks jurisdiction over Larsen's claims based on the *Rooker–Feldman* doctrine. Under the *Rooker–Feldman* doctrine, district courts "lack subject matter jurisdiction to engage in appellate review of state-court determinations or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'" *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of New York and New Jersey Police Dep't*, 973 F.2d 169, 177 (3d Cir.1992) (quoting *District Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 483, 103 S.Ct. 1303, 1316, 75 L.Ed.2d 206 n. 16 (1983)); *see also Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). In addition, *Rooker–Feldman* deprives district courts of

---

5. Although no party has so informed the court, the court presumes that Larsen will undertake

further appeals of his criminal conviction and sentence.

jurisdiction to hear appeals from interlocutory orders issued by lower state courts, *Port Auth.*, 973 F.2d at 177–78, and from entertaining constitutional claims that a litigant could have raised in a prior state court proceeding but chose not to, *Valenti v. Mitchell*, 962 F.2d 288, 296 (3d Cir.1992).

A federal claim is inextricably intertwined with a claim raised in a prior state court proceeding if granting the requested relief would require the district court to overrule a prior state court judgment. *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir.1996). Where a federal court could not grant the federal plaintiff's requested relief without reversing or modifying a previous decision of a state court, the court does not have subject matter jurisdiction to entertain the federal plaintiff's claim. *Marks v. Stinson*, 19 F.3d 873, 885 n. 11 (3d Cir.1994); *Kirby v. City of Philadelphia*, 905 F.Supp. 222, 225 (E.D.Pa.1995).

Prior to the commencement of the Senate impeachment proceedings, on July 26, 1994, Larsen filed suit in the Pennsylvania Commonwealth Court seeking a preliminary injunction enjoining the proceedings. *Larsen v. Senate of Pennsylvania*, 166 Pa.Cmwlth. 472, 646 A.2d 694, 695 (1994). The Senate Defendants argue that under the *Rooker–Feldman* doctrine, Larsen's prior court proceeding and the commonwealth court's decision in that case deprive this court of jurisdiction over Larsen's claims in the instant case.

In his commonwealth court action, Larsen raised several claims similar to the ones he seeks to litigate in the present action, namely that: (1) the Senate improperly delegated to the Senate committee the responsibility for conducting the impeachment trial, (2) the Senate and Senate committee violated his due process rights by failing to grant his motion for an extension of time or rule on other of his pretrial motions, and (3) the Senate and the committee violated his rights to a fair trial and effective assistance of counsel by denying his request for payment

of attorney's fees.[6] *Larsen*, 646 A.2d at 697–98. The commonwealth court declined to address the propriety of the Senate's actions, concluding that the impeachment provisions of the Pennsylvania Constitution commit the impeachment power to the Senate "to an extent which clearly bars the courts from intervening with prior restraint." *Id.* at 705. The court stated:

> Impeachment involves an adjudicative process, but one which has been clearly set apart by the Constitution as distinguished from adjudications by the judicial branch of government, *regardless of whatever powers the courts may have to interpret actions of the legislative body, by way of review, after they have been taken.* As in the case of scrutinizing the constitutionality of statutes themselves, the courts clearly have no power to intervene by injunction in advance of legislative action, any more than a court would have any power to enjoin in advance, the enactment of a law appearing (to the courts) to be constitutionally invalid.

*Id.* (emphasis added). The court interprets the commonwealth court's decision as merely holding that it lacked the authority to issue a prior restraint upon the Senate and the Senate committee. Thus, granting the relief requested by Larsen in the instant action would not require the court to overrule the commonwealth court's prior decision. Indeed, many of the claims that Larsen raises in the present case arose out of the impeachment process itself which had not begun at the time the commonwealth court ruled on his motion for a preliminary injunction. It would have been impossible for Larsen to assert claims at that time based on events that had not yet occurred. Several of Larsen's constitutional claims arose out of the impeachment proceedings, could not have been raised prior to the impeachment trial, and, thus, cannot be considered inextricably intertwined with claims he did raise in the commonwealth court. Additionally, the com-

---

**6.** In the commonwealth court action, Larsen also argued that: (1) his impeachment trial violated the federal constitutional prohibition against double jeopardy, (2) he was not properly subject to impeachment proceedings as the supreme court had already removed him from his position as supreme court justice, and (3) the impeachment charges against him did not amount to a constitutionally valid basis for impeachment. *Larsen*, 646 A.2d at 697–98.

monwealth court recognized the possibility that upon conclusion of the impeachment proceedings, it might possess the power to hear Larsen's claims. *Id.* at 700, 705. The commonwealth court appeared reluctant, however, based on the political question doctrine to make an explicit holding regarding a state court's jurisdiction to hear claims at the completion of the impeachment proceedings. *Id.* at 702–04. Therefore, even if the commonwealth court had held that the political question doctrine prohibited it from hearing Larsen's claims at the conclusion of the impeachment proceedings, granting the relief requested in the present case would not require the court to overrule the commonwealth court's decision that it was barred from entertaining Larsen's claims. Accordingly, the court will not dismiss Larsen's claims against the Senate and individual Senate Defendants based on the *Rooker–Feldman* doctrine.

### C. Political Question Doctrine

[redacted] The Senate and individual Senate Defendants argue that Larsen's constitutional challenge to the manner in which they conducted his impeachment trial involves a political question and that the court should decline to exercise its jurisdiction over Larsen's claims on this basis.

The political question doctrine applies "where there is 'a textually demonstrable constitutional commitment of [an] issue to a *coordinate* political department; or a lack of judicially discoverable and manageable standards for resolving it....'" *Nixon v. United States,* 506 U.S. 224, 228, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993) (emphasis added) (quoting *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962)). The policy behind the political question doctrine derives from the need to maintain separation of powers between coequal branches of government. *Elrod v. Burns,* 427 U.S. 347, 351, 96 S.Ct. 2673, 2679, 49 L.Ed.2d 547 (1976) (citing *Baker,* 369 U.S. at 217, 82 S.Ct. at 710). "[I]t is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the political question." *Baker,* 369 U.S. at 210, 82 S.Ct. at 706 (internal quotations omitted). Thus, the political question doctrine does not prohibit the court from hearing Larsen's constitutional claims arising out of the Senate's actions. *See Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *Gewertz v. Jackman,* 467 F.Supp. 1047, 1055 (D.N.J. 1979).[7] The court will deny the Senate Defendants' motion to dismiss based on the application of the political question doctrine.

### D. The Eleventh Amendment

Several Defendants assert that they are immune from suit pursuant to the Eleventh Amendment. Larsen has sued all Defendants in their official and personal capacities. (Compl. ¶ 13.) Specifically, Larsen asks the court to grant judgment in his favor:

(1) against the Senate and Senators in their official capacities, granting declaratory and injunctive relief, voiding the Senate impeachment verdict of guilty of Article II;

(2) against the Senators in their personal capacities, awarding damages including loss of past and future wages and benefits,

7. The Senate and individual members concede that "[a]lthough in its purest form, the so-called 'political question doctrine' applies only in cases involving the relationship between the federal judiciary and a co-equal branch of the federal government ... this Court's inquiry cannot stop there." (Senate Br. in Supp. at 23.) Neither of the cases cited by Defendants support the extension of the political question doctrine to cases where a federal court is asked to review the constitutionality of actions by a state legislature. Although Defendants quote a rather lengthy passage from the Supreme Court's decision in *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), in which the Court talks about leaving the states free to perform inherent state functions, Defendants omit from their citation an internal quotation to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The Court's citation to *Younger* reveals that the passage addresses the appropriateness of abstention and offers nothing regarding the applicability of the political question doctrine. Likewise, Defendants cite *Davids v. Akers,* 549 F.2d 120 (9th Cir.1977), suggesting that it provides support for their contention that the political question doctrine precludes the court from addressing Larsen's claims. However, the Ninth Circuit in *Davids* explicitly held that the political question doctrine does not apply to the federal judiciary's relationship to the states and addressed the merits of the plaintiffs' claims. *Id.* at 123–27.

emotional harm, injury to reputation, and counsel fees;

(3) against the Supreme Court, ... Judicial Conduct Board, and all individual members, in their official capacities, granting declaratory and injunctive relief: (i) voiding the Court of Judicial Discipline's order dated June 3, 1994, of suspension without pay; (ii) voiding the appointments to the Judicial Conduct Board and the Court of Judicial Discipline; and (iii) voiding the action of interfering with plaintiff's right to practice law;

(4) against the Supreme Court, Court of Judicial Discipline ... and all members in their personal capacities, awarding damages, including loss of past and future wages and benefits, emotional harm, injury to reputation, and counsel fees;

(5) against the Supreme Court and individual justices and Administrative Office and individual members in their official capacities, granting declaratory and injunctive relief, voiding the action of terminating plaintiff's health and medical benefits;

(6) against the Supreme Court and individual justices and Administrative Office and individual members in their personal capacities, awarding damages for medical expenses incurred by plaintiff from June 4, 1994, to date; and,

(7) against all individual defendants in their personal capacities for punitive damages and other such relief as the court may find appropriate.

(Compl. at 29–30.)

"[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). This jurisdictional bar applies regardless of whether the plaintiff is seeking equitable relief or monetary damages. *Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986); *Pennhurst,* 465 U.S. at 100–01, 104 S.Ct. at 908. Additionally, suits against state officials will be deemed suits against the state and barred by the Eleventh Amendment if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Pennhurst,* 465 U.S. at 101 n. 11, 104 S.Ct. at 908 n. 11 (quoting *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (internal quotations omitted)). The one well-known exception to this rule is where a suit challenges the constitutionality of a state official's conduct. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Supreme Court has narrowly applied *Young*'s exception. *Pennhurst,* 465 U.S. at 102, 104 S.Ct. at 909. In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court held that federal courts may award prospective injunctive relief to plaintiffs challenging the constitutionality of a state official's conduct. "Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief of the sort awarded in *Ex parte Young,* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interests in assuring the supremacy of that law." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985).

The Senate, the Supreme Court, and the CJD argue that Larsen's claims against them are in effect claims against the Commonwealth of Pennsylvania and are, therefore, barred by the Eleventh Amendment. The court agrees and will dismiss all claims asserted against the Senate, Supreme Court, and the CJD.

Larsen appears to contest only mildly the contention that his suit against the Senate is a suit against the Commonwealth of Pennsylvania for Eleventh Amendment purposes. Other than citing *Liveright v. Joint Comm. of Tenn. Gen. Assembly,* 279 F.Supp. 205, 211 (M.D.Tenn.1968) in support of his claim that "[a] legislative body is not immune from suit for injunctive relief," Pl.'s Br. in Oppos. at 20, he does not dispute that his suit against the Senate is a suit against the Com-

monwealth.[8] Although the court in *Liveright* did not address the question of whether a legislative body was immune from suit pursuant to the Eleventh Amendment, Larsen asks the court to presume it stands for such a proposition based on the district court's award of injunctive relief against the committee. The court declines to adopt such a theory.

Moreover, Larsen misunderstands the relevant inquiry in determining whether a suit against a state agency is barred by the Eleventh Amendment. The question of whether a state agency is entitled to Eleventh Amendment immunity depends upon whether it is an arm of the state, not upon the type of relief sought. In making the determination of whether an entity is an arm of the state, the Third Circuit has outlined three factors for the court to consider. *See Peters v. Del. River Port Auth.,* 16 F.3d 1346, 1350 (3d Cir.1994), *cert. denied* 513 U.S. 811, 115 S.Ct. 62, 130 L.Ed.2d 20 (1995). First, the court must assess whether if the plaintiff succeeds on his claims the judgment would be paid from the state treasury. Second, the court must examine the status of the entity pursuant to state law. Third, the court should consider the extent of autonomy enjoyed by the entity. The first factor is the most important one. *Id.; see also Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.1989) (en banc).

The court finds that the Senate is entitled to Eleventh Amendment immunity. It is difficult to imagine what entity would be considered an arm of the Commonwealth if the Senate were not. Application of the *Peters* factors seems cumbersome in the present context. The Senate is one of the governing branches of the Commonwealth. Thus, under *Peters,* the question the court is required to answer is, in essence, whether the Senate is independent from itself. Any

judgment obtained by Larsen would be satisfied by the state treasury and the court concludes that the Senate is an arm of the Commonwealth for Eleventh Amendment immunity purposes.

 The court reaches the same conclusion with regard to the Supreme Court, and at least one other court has already so held. *Mattas v. Supreme Court of Pennsylvania,* 576 F.Supp. 1178, 1182 (W.D.Pa.1983). In addition, the court finds that the CJD is entitled to Eleventh Amendment immunity. The CJD is created pursuant to the Pennsylvania Constitution. Pa. Const. art. 5, § 18(b). Appointments to the CJD are made by the Supreme Court and the Governor. *Id.* art. 5, § 18(b)(1). The CJD's funding is part of the Supreme Court budget, which flows directly from the budget for the judicial branch as approved by the Pennsylvania legislature. Any judgment obtained against the CJD would be paid out of state funds. Accordingly, the court will dismiss Larsen's claims against the Supreme Court and the CJD because it finds they are immune from suit pursuant to the Eleventh Amendment.[9]

 The individual members of the Senate, Supreme Court, the CJD, the JCB and Defendants Frankforter and Sobolevitch also argue that they are entitled to Eleventh Amendment immunity.[10] Larsen has sued these Defendants in both their official and personal capacities. The Eleventh Amendment does not insulate Defendants from Larsen's claims against them in their personal capacities. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). This is also true for Larsen's claims for punitive damages against Defendants as well. *Smith v. Wade,*

---

8. The court notes that *Liveright* was decided before the majority of the Supreme Court's decisions outlining the scope of the Eleventh Amendment.

9. Although the Administrative Office of the Pennsylvania Courts argues that it is entitled to Eleventh Amendment Immunity, the AO's arguments were conclusory and provide little basis for the

court to conclude at this juncture that this is so. Accordingly, the court will deny the AO's motion to dismiss based on Eleventh Amendment grounds.

10. Larsen has dismissed his claims against the JCB and its individual members in their personal capacities.

461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).[11]

■■■ "[W]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Pennhurst*, 465 U.S. at 102–03, 104 S.Ct. at 909 (citing *Edelman*, 415 U.S. at 666–67, 94 S.Ct. at 1357). Larsen asks the court to "void" the Senate Defendants' impeachment verdict of guilty, the Supreme Court Defendants' appointments to the JCB, the CJD Defendants' interim order suspending him without pay, and enjoin Defendants Sobolevitch and Frankforter's from failing to reinstate his lifetime medical insurance benefits.[12] (Compl. at 29 ¶¶ (1), (3), (5).) In determining whether Larsen's claims are barred by the Eleventh Amendment, the court must determine whether his claims against the individual members in their official capacities are retrospective or prospective in nature. The court finds that they are.

Larsen's request that the court void the Senate members' impeachment verdict of guilty is, in essence, a request for prospective reinstatement or a direction to the members that they rescind their guilty verdict. Thus, the relief Larsen seeks against the individual Senate Defendants in their official capacities is not prohibited by the Eleventh Amendment. *See Warnock v. Pecos County, Tex.*, 88 F.3d 341, 343 (5th Cir.1996) (claims for prospective reinstatement not barred by Eleventh Amendment); *Cross v. State of Ala.*, 49 F.3d 1490, 1503 (11th Cir.1995) (district court properly enjoined state officials from failing to reinstate state employees); *Russell v. Dunston*, 896 F.2d 664, 668 (2d Cir.1990) (existence of past harm does not render prospective injunction retrospective relief barred by Eleventh Amendment); *see also Berman Enterprises, Inc. v. Jorling*, 3 F.3d 602, 606–07 (2d Cir.1993) (claim for declaratory relief seeking to vacate state officials' administrative orders not barred by

Eleventh Amendment); *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir.1989) (Eleventh Amendment did not bar request for injunctive relief that state officials remove false allegations from employment record); *Darlak v. Bobear*, 814 F.2d 1055, 1061 (5th Cir. 1987) (request for injunctive relief requiring state officials to rescind suspension not prohibited pursuant to Eleventh Amendment). The court also finds that the Eleventh Amendment does not bar Larsen's claims for declaratory and injunctive relief against the individual members of the Supreme Court, the JCB, the CJD and Defendants Frankforter and Sobolevitch in their official capacities. These claims include Larsen's requests that the court: (1) vacate the Supreme Court Defendants' appointments to the JCB and CJD; (2) vacate the CJD Defendants' order suspending him without pay; (3) enter a declaratory judgment as to the JCB and CJD Defendants' authority to act with regard to his right to practice law; and (4) enjoin Defendants Sobolevitch and Frankforter from failing to reinstate his lifetime medical insurance benefits. Accordingly, the court will deny the individual Senate Defendants', the Supreme Court Defendants', the CJD Defendants' and JCB Defendants', and Defendants Frankforter's and Sobolevitch's motions to dismiss Larsen's claims for declaratory and injunctive relief against them in their official capacities.

### E. Legislative Immunity

■■■ The Senate Defendants assert that they are absolutely immune from suit in their personal capacities based on the doctrine of absolute legislative immunity. Legislators are entitled to absolute immunity for actions taken in their legislative capacity. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 406, 99 S.Ct. 1171, 1179–80, 59 L.Ed.2d 401 (1979); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Larsen argues that

11. The complaint alleges that Larsen is suing both the Supreme Court, as a body, and the CJD, as a body, in their "personal" capacities. (Compl. at 30. ¶¶ (4), (6).) Neither of these entities exist in anything other than their "official" capacity and Larsen's attempt to sue the bodies in their "personal" capacities is mis-

placed and his claims against them in this regard will be dismissed.

12. Larsen also asks the court to void the JCB and CJD Defendants' "action of interfering with [his] right to practice law." (Compl. at 29 ¶ (3).)

the Senate Defendants are not entitled to absolute legislative immunity because the Senate impeachment proceeding did not constitute a legislative act.

The purpose of affording legislators absolute immunity is so that' they "are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good." *Tenney,* 341 U.S. at 377, 71 S.Ct. at 788. Thus, the Supreme Court has held that legislators are immune from suits against them in their personal capacities if they "were acting within the legitimate sphere of their legislative activity." *Id.* at 376, 71 S.Ct. at 788. While it is true that a conviction of impeachment may not involve "policy-making," *Acierno v. Cloutier,* 40 F.3d 597, 610 (3d Cir.1994), conducting impeachment trials is one of the responsibilities charged to the United States and Pennsylvania legislatures and is within the legitimate sphere of legislative activity. Indeed, no other governmental body possesses such responsibility.

Larsen cites *Government of V.I. v. Lee,* 775 F.2d 514, 520–21 (3d Cir.1985), in support of his argument that legislative immunity shields legislators from suit only for acts done in the process of enacting legislation. The issue in *Lee* was whether legislative fact-finding is the type of activity protected by legislative immunity. The Third Circuit held that it is, stating "fact-finding occupies a position of sufficient importance in the legislative process to justify the protection afforded by legislative immunity." *Id.* at 521. It appears from the court's review of the case law that virtually all of the cases which address the question of whether legislators are entitled to legislative immunity are cases in which legislators were engaged in activities that are accurately characterized as prerequisites to, or ancillary to, the ultimate legislative acts of proposing, debating, and passing legislation. *See Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 504–05, 95 S.Ct. 1813, 1822, 44 L.Ed.2d 324 (1975) (members of Congress shielded by legislative immunity in issuing subpoena in context of authorized congressional investigation); *Tenney,* 341 U.S. at 377–78, 71 S.Ct. at 788–89 (state legislative committee investigation into "un-american" activities within legitimate sphere of legislative activity). The activities engaged in by the Senate Defendants in the present case were also prerequisites to, or ancillary to, the legitimate legislative act of impeachment. In conducting the impeachment proceedings, the Senate Defendants "were acting in a field where legislators traditionally have power to act." *Tenney,* 341 U.S. at 379, 71 S.Ct. at 789. Pursuant to the United States Constitution, the United States Senate is granted sole authority to conduct impeachment trials. *Nixon v. United States,* 506 U.S. 224, 229, 113 S.Ct. 732, 735–36, 122 L.Ed.2d 1 (1993). The Pennsylvania Constitution grants similar authority to the Pennsylvania Senate. Pa. Const. art. 6, § 5 ("All impeachments shall be tried by the Senate."). The fact that legislators are not often called upon to conduct impeachment proceedings does not make their actions any less legislative in nature than those actions undertaken in passing legislation. All of the conduct by the Senate Defendants of which Larsen complains was undertaken in pursuit of the impeachment proceedings against him. In order to remove the Senate members actions from the shield of legislative immunity, Larsen would need to allege that their actions in some way "usurp[ed]" the impeachment authority vested in them by the Pennsylvania Constitution. *Tenney,* 341 U.S. at 378, 71 S.Ct. at 789. Larsen makes no such allegation. Accordingly, the court finds that dismissal of Larsen's claims against the Senate Defendants in their personal capacities is proper because they are entitled to absolute legislative immunity.

## F. Abstention

### (1) The CJD and JCB Individual Defendants

■ The CJD and JCB Defendants argue that given the current proceedings pending before it, the court should abstain from hearing Larsen's claims against them pursuant to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

The proceedings currently before the CJD were instituted on April 18, 1994 when the JCB filed an application with the CJD for an interim order directing that Larsen be sus-

pended from his duties without pay. The basis underlying the JCB's application was Larsen's conviction on April 9, 1994 in the Allegheny Court of Common Pleas finding Larsen guilty on two counts of criminal conspiracy under the Controlled Substances Act. On May 5, 1994, Larsen filed an answer with new matter to the JCB's application. On May 16, 1994, the JCB filed a response to new matter. On May 25, 1994, the CJD conducted a hearing on the JCB's application. The jury's verdict against Larsen was admitted into evidence. Larsen's counsel moved that the hearing be bifurcated in order to allow the introduction of testimony at a later date. The CJD denied the motion. On June 3, 1994, the CJD granted the JCB's application and entered an order directing Larsen's suspension without pay. *In re Justice Rolf Larsen,* 655 A.2d 239 (C.J.D.1994). On June 6, 1994, the JCB filed with the CJD a "Board Complaint—Formal Charges" against Larsen. Larsen maintains that the JCB Defendants have wrongfully asserted that they have the right to seek the revocation of Larsen's right to practice law and that their decision to lodge charges against him was in retaliation for his prior protected statements regarding Justices Zappala, Cappy and Chief Justice Nix. Larsen claims that the CJD Defendants acted without authority in entering the interim order suspending Larsen without pay. Specifically, he claims that because the Pennsylvania Constitution permits the interim suspension of judicial officers only in instances where a justice has been indicted or charged with a felony, the CJD's order suspending Larsen based on his two criminal *convictions* was improper. Larsen also alleges that the CJD Defendants have "wrongfully asserted" that they have authority over his right to practice law in the Commonwealth of Pennsylvania. Furthermore, Larsen maintains that the CJD Defendants were motivated to issue the interim order based on Larsen's prior statements in his petitions for disqualification and recusal. Larsen seeks an order from this court voiding the CJD's June 3, 1994 order, "voiding

the action of interfering with [his] right to practice law," (Compl. at 29, ¶ 3), and awarding damages against the individual members of the CJD in their personal capacities.

"*Younger v. Harris* ... and its progeny espouse a strong federal policy against federal-court interference with pending [state] judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). The policies underlying abstention include "'a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'" *Id.* (quoting *Younger,* 401 U.S. at 44, 91 S.Ct. at 750). "The policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved." *Middlesex County,* 457 U.S. at 432, 102 S.Ct. at 2521. The Supreme Court has applied *Younger* in the context of attorney disciplinary proceedings, *Middlesex County,* 457 U.S. at 432, 102 S.Ct. at 2521, and the Third Circuit has applied *Younger* in the context of judicial removal proceedings, *Coruzzi v. State of New Jersey,* 705 F.2d 688, 690 (1983).

The Supreme Court has outlined three relevant areas of inquiry in determining whether abstention under *Younger* is appropriate. First, is there an ongoing state judicial proceeding? Second, does the proceeding implicate important state interests? Third, does the plaintiff have an adequate opportunity to raise his constitutional challenges in the context of that proceeding? *Middlesex County,* 457 U.S. at 432, 102 S.Ct. at 2521.

**(a) The Existence of an Ongoing State Judicial Proceeding**

Further CJD proceedings relating to the formal charges against Larsen have been stayed at his request.[13] (*See* Defs.' Ex. S,

13. In evaluating the merits of Defendants' motions, the court has relied on documents outside of the complaint which are referred to in the complaint or which are public records. Both

categories of documents are the types of documents which the court may properly consider without converting the instant motions to dismiss to motions for summary judgment. *Pension Ben-*

Joint Motion for Continuance, *In re Larsen,* CJD No. 4 JD 94.) In addition, the CJD proceedings are also pending with respect to the CJD's interim order because it permits Larsen to move for modification or vacation of the order based on changed circumstances. *In re Larsen,* 655 A.2d at 243, 249. Larsen opines that there is presently no proceeding against him because the CJD's interim order is not appealable. Pa. Const. art. 5, § 18(d)(2). Larsen's argument is without merit as the CJD's order specifically permits him to seek modification of the order under the appropriate circumstances. Moreover, Larsen himself has consented to stay the formal proceedings against him, of which the interim order is a component. The means by which to challenge the lodging of charges against him and the granting of the interim order are readily available to Larsen through the resumption of the proceedings before the CJD relating to the JCB's formal complaint against him.

The court also finds that the proceedings in front of the CJD, including both the proceedings leading up to the issuance of the interim order and the proceedings relating to the JCB's formal complaint, are judicial in nature "since [they] bea[r] several of the indicia of a judicial action." *Coruzzi,* 705 F.2d at 690. The JCB instituted interim proceedings against Larsen by filing an application, akin to a motion for a preliminary injunction. Larsen filed an answer and new matter and the JCB filed a response. The CJD subsequently conducted a hearing on the JCB's application. At the hearing, Larsen was represented by counsel and was offered the opportunity to take the stand as a witness on his own behalf, although he declined to do so. *In re Larsen,* 655 A.2d at 242. Furthermore, the JCB initiated formal proceedings against Larsen with the filing of a complaint pursuant to Article 5, Section 18(a)(7). Proceedings before the CJD proceed in accordance with the law of evidence and parties appearing before the court have the right to discovery, to subpoena witnesses and to compel the production of documents, books, accounts, and other relevant records. Pa. Const. art. V, § 18(b)(5). Parties ap-

pearing before the CJD are presumed innocent and all decisions of the CJD are to be in writing and contain findings of fact and conclusions of law. *Id.*

Additionally, the removal proceedings against Larsen are judicial in nature because they require the CJD to "investigate, declare, and enforce liabilities as they stood on present or past facts and under laws supposed already to exist." *Coruzzi,* 705 F.2d at 690–91 (internal quotations and alterations omitted).

#### (b) The Existence of Important State Interests

It is clear that "[Pennsylvania's] interests in assuring the ethical conduct of its judges and maintaining the integrity of its judiciary are no less significant," *Coruzzi,* 705 F.2d at 691, than the interest the State of New Jersey possessed in "maintaining and assuring the integrity of the attorneys it licenses," *Middlesex County,* 457 U.S. at 434, 102 S.Ct. at 2522. Granting the relief requested by Larsen would "substantially interfere with the state's removal proceeding accompanied by a suspension without pay, by preempting the adjudication of a claim that could have been raised in that proceeding." *Coruzzi,* 705 F.2d at 691.

#### (c) Larsen's Opportunity to Raise his Constitutional Claims Before the CJD

The court does not find that Larsen is precluded from raising his constitutional claims before the CJD. The court notes that the only two *federal* constitutional claims which Larsen raises regarding the CJD Defendants' authority to act are (1) his rather amorphous claim that the Supreme Court improperly appointed members to the CJD and, therefore, that the CJD's decision to issue its interim order was in violation of Larsen's due process and equal protection rights, and (2) his claim that the CJD impermissibly relied upon his prior statements in his petitions for the disqualification and recusal of Justices Zappala and Cappy when the CJD decided to issue the interim order. Larsen's remaining claims relate to whether the JCB and CJD Defendants' actions were

*efit Guarantee Corp. v. White Consolidated Indus.* *Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993).

**1566**

proper under the Pennsylvania Constitution and whether they have the authority to pursue the revocation of his right to practice law. Larsen's ability to litigate his state constitutional claims before the CJD are not of concern to the court in evaluating whether abstention is proper.[14] *Middlesex County,* 457 U.S. at 434, 102 S.Ct. at 2522 (deciding whether abstention appropriate based on whether plaintiff has adequate opportunity to raise federal challenges).

The CJD's opinion underlying the interim order does not indicate that Larsen attempted to raise to the CJD either of the federal constitutional challenges he seeks to raise in this court. From the CJD's exhaustive consideration of Larsen's state law claims, nothing in the court's opinion suggests it would fail to hear Larsen's federal constitutional claims. To the contrary, the CJD's opinion evidences that it gave a great deal of consideration to all of Larsen's state law claims.

The court finds that Larsen has not established that he will be unable to raise his federal constitutional claims before the CJD. First, Larsen's claims that the Supreme Court has improperly appointed members to the JCB and the CJD is more appropriately asserted against the Supreme Court and not the CJD and its individual members or the JCB's individual members. *See infra* § (F)(2). Second, if Larsen intends to make allegations of bias by the CJD and JCB Defendants he has offered no reason why he cannot assert such claims before the CJD just as litigants in this court must raise their claims of judicial bias by filing a motion for recusal. Larsen's claims of bias by the JCB would also be properly raised before the CJD as claims of prosecutorial bias.

In addition, Larsen has not demonstrated that the ongoing CJD proceedings will not afford him the opportunity to raise his First Amendment retaliation claims. Again, if

Larsen is asserting these claims as a means of alleging bias on behalf of the CJD, the JCB or their members, he has articulated no reason why his situation is any different than any other litigant who is required to raise such claims in the tribunal before which he is appearing. Larsen claims that the CJD is not authorized to determine federal constitutional questions. However, nothing in the Pennsylvania Constitution prohibits the CJD from hearing such claims. The fact that the CJD is comprised of non-judges and non-lawyers provides an insufficient basis upon which to conclude that the proceedings before the CJD will not afford him an opportunity to litigate his constitutional claims. *See Middlesex County,* 457 U.S. at 435, 102 S.Ct. at 2523 (noting not all members of ethics committee conducting attorney disciplinary proceedings were lawyers).

Because the court finds that abstention is appropriate under *Younger v. Harris,* it will dismiss Plaintiff's claims against the individual JCB Defendants and the individual CJD Defendants in their official capacities.

**(2) The Individual Supreme Court Defendants, Administrative Office of the Courts, and Defendants Sobolevitch and Frankforter**

▆ The court also finds that abstention is proper with regard to Larsen's claims asserted in parts II(a) & (b) of the amended complaint against the individual members of the Supreme Court. In part II(a), Larsen alleges that the Supreme Court Defendants' appointments to the CJD "were done in an improper manner to deny [him] due process of law and equal protection of the law in the within proceedings." (Compl. ¶ 97.) Furthermore, Larsen claims that "[s]ome members of the . . . CJD were appointed to serve because they had close ties to members of the Supreme Court, with the result that Justice Larsen was denied due process of law

---

**14.** Several of the state claims Larsen raises in the complaint relating to the CJD's authority to act were considered and decided by the CJD in its decision underlying the issuance of the interim order. *In re Larsen,* 655 A.2d at 242–46. Thus, the *Rooker–Feldman* doctrine would likely deprive the court of jurisdiction to entertain Larsen's claims contained in paragraphs ninety-two and ninety-three of the complaint were it in-

clined to address the merits of his claims. Additionally, Larsen's argument that the CJD cannot properly consider whether it has jurisdiction to act is completely without merit. A court is under the obligation at all times to determine whether it has jurisdiction over a particular case and to take particular action, regardless of whether either of the parties before it have raised such a challenge.

and equal protection of the law." (*Id.* ¶ 98.) In part II(b), Larsen alleges that his statements regarding Justices Cappy, Zappala and Chief Justice Nix were substantial or motivating factors in the Supreme Court Defendants' decisions to appoint certain members to the CJD and JCB.

Although Larsen does not allege in part II(a) the specific injury he suffered as a result of the Supreme Court Defendants appointment of CJD and JCB members in an "improper manner" the court can discern only two possible injuries of which he could complain, that of bias or some impropriety in the CJD Defendants' issuance of the interim order suspending him without pay and/or impropriety in the JCB Defendants' decision to proceed against him. The court's interpretation of the amended complaint is bolstered by Larsen's contention in part II(b) that as a result of the Supreme Court Defendants taking into account his prior protected speech, he "was injured in that he was suspended without pay and improper action was taken against him with respect to his right to practice law." (*Id.* ¶ 103.) Thus, the injury which Larsen claims he suffered as a result of the Supreme Court Defendants' appointments is the lodging of charges against him and the improper issuance of the interim order.

Abstention with regard to these claims is mandated by the fact that a determination of Larsen's allegations would necessarily involve an evaluation of whether the JCB Defendants acted with bias in seeking the interim order and filing a formal complaint against Larsen and whether the CJD acted with bias or improper intent in issuing the interim order. To evaluate these claims would require the court to interfere with the ongoing removal proceedings. The court has already found that the existence of these ongoing state proceedings requires the court to abstain from entertaining Larsen's claims against the CJD and JCB Defendants and

that Larsen has failed to demonstrate why the proceedings before the CJD do not afford him the opportunity to raise his claims of bias. Thus, abstention with regard to Larsen's allegations against the individual members of the supreme court in parts II(a) and (b) is also proper.[15]

## G. Failure to State a Claim

The Senate Defendants argue that dismissal of Larsen's claims against them in their official capacities is proper based on his failure to allege facts which, if proven, would entitle him to relief. Larsen asserts two separate claims against the Senate Defendants. Larsen claims that he had both property and liberty interests in his position as a supreme court justice and in not being barred from holding office. Accordingly, he alleges that the Senate Defendants' impeachment of him violated his right to due process pursuant to the Fourteenth Amendment to the United States Constitution. Larsen also avers that the Senate impeachment proceedings were subject to the procedural protections of the Sixth Amendment, which he claims were not adhered to in the impeachment process. The court will address Larsen's allegations *seriatim.*

### (1) Deprivation of Property Interest

The Senate Defendants argue that Larsen did not possess a property interest in his position as a supreme court justice and that they were not required to comport with constitutional due process protections in impeaching him.

▆▆ Whether or not Larsen had a property in interest in his position is a question properly answered by looking to Pennsylvania law. *Independent Enterprises Inc. v. Pittsburgh Water and Sewer Auth.,* 103 F.3d 1165, 1177 (3d Cir.1997) (citing *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Thus, "[a]ccording to the teachings of *Roth* ... [Larsen] may not

---

**15.** The court recognizes that Larsen seeks to have this court void the supreme court's appointments to the CJD and JCB, a remedy which neither the CJD nor the JCB can provide. The only basis upon which to conclude that such a remedy would be appropriate would be a decision by the court that Larsen had been injured as a result of the improper manner in which the supreme court made appointments to the CJD and JCB. Making such a determination would require the court to intercede in the ongoing state proceedings and review the proceedings for bias on behalf of the CJD and/or the JCB.

pursue [his] procedural due process claims ... unless an independent source such as state law affords [him] a legitimate claim of entitlement" to his post as a supreme court justice. *Independent Enterprises,* 103 F.3d at 1177 (internal quotations omitted). Larsen cites to no state law as the source of his alleged property right.

Defendants, on the other hand, point to several decisions by the Pennsylvania Supreme Court which make clear that in Pennsylvania, an elected official possesses at best a "highly circumscribed" interest in his office. *Sweeney v. Tucker,* 473 Pa. 493, 375 A.2d 698, 713 (1977); *see also In re 1991 Pennsylvania Legislative Reapportionment Comm'n,* 530 Pa. 335, 609 A.2d 132, 140–41 (1992). Indeed, in *In re Legislative Reapportionment Comm'n,* the Pennsylvania Supreme Court explicitly stated that "elected officials' interest in their offices does not merit constitutional protection." 609 A.2d at 141. In discussing whether a state legislator possesses a property interest in his office entitling him to procedural due process protections prior to his expulsion from the legislature, the court in *Sweeney* stated:

> An elected office is a public trust, not the private domain of the officeholder.... He holds office for the benefit of his constituents and cannot justifiably rely on a private need or expectation in holding office. He is periodically accountable to his constituents through the electoral process. Due to the paramount public interest in the integrity of the legislative process, the Pennsylvania Constitution provides for expulsion by two-thirds vote of the representatives of the people of the entire state. A member of the Legislature is thus subject to the political process at all times. This is properly so for the public interest in the office far outweighs any private interest of the officeholder. *An elected official can never have tenure in the same sense as an ordinary public employee.*

375 A.2d at 713 (emphasis added). Larsen argues that *Sweeney* and *In re 1991 Reapportionment Comm'n* are distinguishable from the instant case because they did not address supreme court justices' entitlement to office. He opines that because supreme court justices are elected for ten year terms and may be appointed by the governor to complete an unexpired term of a justice who resigns, retires or dies, justices are not "subject to the political process at all times."

Larsen overlooks the fact that supreme court justices are subject to impeachment by a two-thirds vote of the Senate just as a member of the legislature is subject to expulsion by a two-thirds vote of either house of the Pennsylvania legislature. Thus, Larsen, like the legislator in *Sweeney,* is in fact "subject to the political process at all times." Additionally, although as elected officials supreme court justices do not represent their constituents by instituting public policy in the same manner as legislators, i.e. enacting legislation, they hold office "for the benefit of their constituents" because their constituents have elected them to dispense justice in accordance with the principles they have expressed publicly in seeking judicial office. Thus, as in the case of state legislators, the "public interest" in the office of a supreme court justice "far outweighs any private interest of the [justice]" himself. *Sweeney,* 375 A.2d at 713.

In support of his position that he had a property interest in his position, Larsen cites *Guarino v. Larsen,* 821 F.Supp. 1040 (E.D.Pa.), *rev'd on other grounds,* 11 F.3d 1151 (3d Cir.1993). *Guarino* involved a claim by Judge Guarino, a retired Court of Common Pleas judge on active service, that the Pennsylvania Supreme Court's revocation of his senior judge status without prior notice of any charges against him violated his due process rights. The district court held that Judge Guarino had a property right in being a senior judge until the expiration of his term of appointment and pursuant to the Pennsylvania Constitution, as a justice of the Pennsylvania Supreme Court. Judge Guarino had been removed from the bench pursuant to an order issued by then Justice Larsen. In concluding that Judge Guarino had a property right as a supreme court justice, the district court relied upon Article 5, Section 18 of the Pennsylvania Constitution which provides for the removal of judicial officers through the procedure involving the JCB and the CJD. The court concluded that because Jus-

tice Larsen had removed Judge Guarino from his duties without following the procedures outlined in Section 18, the supreme court had denied Judge Guarino of due process.

■ The district court in *Guarino* concluded that Guarino possessed a property right "based on the due process guarantee provided to all Pennsylvania justices and judges under the Constitution of Pennsylvania." 821 F.Supp. at 1057. This court presumes that the court in *Guarino* was relying upon Article 5, Section 18 in reaching its conclusion. This court, however, is not inclined to reach a similar conclusion in the instant case. The district court's opinion in *Guarino* does not address the Pennsylvania Supreme Court's decisions in *Sweeney* and *In re 1991 Reapportionment Comm'n* in which the supreme court clearly stated that an elected official's property interest in his or her position is at best "highly circumscribed." Moreover, the mere existence of procedural protections, like the procedures outlined in Article 5, Section 18, are insufficient to create a property interest in one's post. "The existence of a property interest in employment turns on the substantive protection afforded the employee under state law, not the procedural protection." *Blanding v. Pennsylvania State Police*, 12 F.3d 1303, 1306 n. 2 (3d Cir.1993). A public employee has a property interest in his job if state law provides that the employee may only be terminated for cause. *Id.* at 1306. Thus, to the extent that the district court in *Guarino* relied exclusively upon the procedures outlined in Article 5, Section 18 in concluding that Guarino possessed a property interest in his position, this court respectfully declines to adopt its reasoning.

The court recognizes that in reaching its conclusion, the *Guarino* court have relied on the "for cause" bases for the removal of judicial officers delineated in Article 5, Section 18 of the Pennsylvania Constitution. Again, however, based on the Pennsylvania Supreme Court's decisions in *Sweeney* and *In re 1991 Reapportionment Comm'n*, this court does not find that the "for cause" grounds listed in Section 18 afforded Larsen an unqualified property interest in his office.

In *Sweeney*, the Pennsylvania Supreme Court held that legislators possessed a highly circumscribed interest in their offices despite the fact that the Pennsylvania Constitution contains the following language:

> Each House shall have power to determine the rules of its proceedings and punish its members or other persons for contempt or disorderly behavior in its presence, to enforce obedience to its process, to protect its members against violence or offers of bribes or private solicitation, and, with the concurrence of two-thirds, to expel a member, but not a second time for the same cause....

Pa. Const. art. 2, § 11.

This paragraph, which the court reads as a "for cause" provision, is no different than provisions governing the removal of judicial officers contained in Article 5, Section 18(d)(1).[16] Thus, in Pennsylvania, despite the fact that the Pennsylvania Constitution delineates limited bases which would justify a public official's removal from office, the nature of elected office as a public trust and the fact that public officials are subject to the political process at all times means that an elected official may "never have tenure in the same sense as an ordinary public employee." *Sweeney*, 375 A.2d at 713. It is the *Guarino* court's failure to distinguish the Pennsylva-

---

**16.** Section 18(d)(1) reads:

A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for conviction of a felony; violation of section 17 of this article; misconduct in office; neglect or failure to perform the duties of office or conduct which brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court.

Pa. Const. art. 5, § 18(d)(1). Section 17 prohibits judicial officers from practicing law, holding office in a political party or organization, or holding a position in the federal or state government. Pa. Const. art. 5, § 17(a). Section 17 also states "[j]ustices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court." *Id.* § 17(b).

nia Supreme Court's decisions in *Sweeney* and *In re 1991 Reapportionment Comm'n* that permits this court to reach a different conclusion regarding whether justices of the supreme court possess an unqualified property interest in their elected office. Given the "highly circumscribed" nature of Larsen's interest in his position as a supreme court justice, the court finds that for the most part, whatever procedural safeguards to which he was entitled pursuant to the Fourteenth Amendment were met by the impeachment proceedings.

 The court notes that several of the claims made by Larsen appear to stem from his belief that the Senate was required to conduct the impeachment trial as this court would conduct a criminal trial.[17] The Supreme Court was confronted with a similar claim in *Nixon v. United States,* 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993). In *Nixon,* former Chief Judge Nixon of the United States District Court for the Southern District of Mississippi argued that the United States Senate's procedure of appointing a committee to receive and hear evidence in impeachment proceedings violated the Constitution's requirement that the Senate "try" all impeachments because it prohibited most Senators from participating in the evidentiary hearings. 506 U.S. at 228, 113 S.Ct. at 735. The Court rejected Nixon's assertion that the word "try" imposes a requirement on the Senate that the proceedings be in the form of a judicial proceeding. *Id.* The Constitution specifies that when trying impeachments, Senators are to be under oath, that no person shall be convicted by less than a two-thirds vote, and that when the President is tried, the Chief Justice shall preside over the proceedings. The Court declined to infer additional constitutional limitations on the form of impeachment proceedings.

This court recognizes that the *Nixon* Court was concerned primarily with whether the federal impeachment clause lacked "judicially discoverable and manageable standards," thus demonstrating an intent by the framers to commit the authority to conduct impeachment proceedings to the Senate alone. *Id.* at 230–31, 113 S.Ct. at 736. The fact that the issue decided by the Court in *Nixon* was whether Nixon's challenge to the Senate impeachment proceedings constituted a nonjusticiable controversy, does not lessen the import of the Court's discussion in evaluating what precisely the United States Constitution, and by extension the Pennsylvania Constitution, requires in the way of impeachment proceedings. Thus, the court concludes that although the *Nixon* Court ultimately concluded that it would not reach the merits of Nixon's challenge to his impeachment proceedings, it did so in part based on reasoning which is relevant in evaluating the merits of the allegations Larsen raises in the instant case.

The language in the Pennsylvania Constitution outlining the procedure to be followed by the Senate in conducting impeachment proceedings is quite similar to that contained in the United States Constitution. Article 6, Section 5 of the Pennsylvania Constitution reads, "[a]ll impeachments shall be tried by the Senate. When sitting for that purpose the Senators shall be upon oath or affirmation. No person shall be convicted without the concurrence of two-thirds of the members present." Larsen has proffered no reason why the court should interpret the word "tried" to require an impeachment proceeding in the nature of a judicial trial and depart from the reasoning articulated by the Supreme Court in *Nixon* regarding identical language in the United States Constitution. Article 6, Section 5 contains precisely the same two requirements for impeachment proceedings as the federal constitution—that the Senators shall be under oath when conducting impeachment trials and that no per-

---

17. Larsen asserts, *inter alia,* that his due process rights were violated by the Senate delegating responsibility for the proceedings to the Senate impeachment committee. Larsen complains that, as a result, most members of the Senate did not hear the evidence presented against him. (Compl. ¶ 58(a).) He opines that "[g]iven the nature of the charge, the remoteness in time of the events alleged, motivation of witnesses, and the sharply conflicting testimony, due process required members of the Senate to hear and observe the witnesses testify in person." (Compl. ¶ 58(c).) See n. 19 *infra* for further allegations which fail pursuant to the Court's reasoning in *Nixon.*

son shall be convicted on anything less than a vote of two-thirds of the members present.

The court's acceptance of the *Nixon* court's conclusion that the language "tried" does not require a judicial-type trial renders meritless several of Larsen's claims. First and foremost, *Nixon* demonstrates that Larsen did not have a right to have all of the Senate members present during the impeachment hearings. The Senate's delegation of the responsibility for conducting the proceedings to the committee was constitutionally permissible. Thus, Larsen's allegations contained in paragraphs 58(a), (c), (d), (e), (i) of the amended complaint fail and will be dismissed.[18]

Dismissal of the allegations contained in paragraphs 58(a), (c), (d), (e), (i), in addition to other claims, is also proper due to Larsen's failure to establish that due process protections entitled him to these procedures. The question of what process Larsen was due in the context of his impeachment trial is not easily answered. Given Larsen's status as an elected official his interest in his position was not akin to the interest possessed by a public employee who possessed an unqualified constitutionally protected property interest in his job. Thus, although the court concludes that Larsen was entitled to some pretermination process, it does not find that he was entitled to the type of process afforded an employee who has an unqualified constitutionally protected property interest in his job.

Nevertheless, in determining whether Larsen has alleged impermissible deficiencies in the pretermination procedures he received, it is instructive to look to cases addressing due process claims brought by public employees who possess property interests in their job. As the following discussion will illustrate, even under the standards governing the procedural protections afforded employees with property interests greater than Larsen's, Larsen has failed to allege facts which, if proven, state a claim for a violation of due process. The court will review the procedur-

al protections to which public employees possessing property interests in their jobs are entitled.

The Supreme Court has described the "root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (internal quotations omitted). "This principle requires *some kind of hearing* prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (internal quotations omitted) (emphasis added). A hearing is necessary in order to permit the employee an opportunity to "present his side of the case," *id.* at 543, 105 S.Ct. at 1494, and serves as "an initial check against mistaken decisions— essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action," *id.* at 545–56, 105 S.Ct. at 1495. The hearing may be informal—"a full evidentiary [and adversarial] hearing is not required." *Curry v. Pa. Turnpike Comm'n*, 843 F.Supp. 988, 992 (E.D.Pa.1994); *see also Loudermill*, 470 U.S. at 545, 105 S.Ct. at 1495. Also, a full hearing before the final decision-maker is not required. *McDaniels v. Flick*, 59 F.3d 446, 454 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996). The employee may present "his side of the story" either orally or in writing. *Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495.

Furthermore, the notice to which an employee is entitled must provide "a sufficient explanation of the employer's evidence to permit a meaningful response." *Fraternal Order of Police, Lodge No. 5 v. Tucker*, 868 F.2d 74, 79 (3d Cir.1989). "The employee need not be informed of all the evidence, but must be given a meaningful opportunity to respond in the sense that he must know the substance of the case the employer has against him." *Barkauskie v. Indian River*

---

18. In paragraph 58(d), Larsen asserts that the committee and the Senate improperly proceeded without establishing a standard of proof. Paragraph 58(e) and (i), respectively, assert that the committee and the Senate failed to adopt rules of evidence for the proceedings and that Larsen was precluded from effectively cross-examining witnesses.

*Sch. Dist.*, 951 F.Supp. 519, 533 (D.Del. July 23, 1996). An employer is not required to present an employee with notice of the proffered reasons for termination prior to the hearing—"notice of the charges may be served at the time of the pretermination hearing." *Curry*, 843 F.Supp. at 992 (citing *Edmundson v. Borough of Kennett Square*, 4 F.3d 186 (3d Cir.1993)). The court will address each of Larsen's allegations in light of the standards outlined above.

▅▅▅ Larsen claims that his due process rights were violated in that most members of the Senate did not participate in the impeachment hearings and, thus, did not hear the evidence presented against him prior to voting. (Compl. ¶ 58(a).) Due process does not require that Larsen receive a hearing before the final decision-maker.[19] *McDaniels*, 59 F.3d at 454. In addition, Larsen maintains that due process required the Senate Defendants to establish a standard of proof and/or rules of evidence. (Compl. ¶ 58(d), (e).) Larsen's claims fail since the due process clause does not require a formal evidentiary hearing prior to the dismissal of a public employee possessing a property interest in his job. *Loudermill*, 470 U.S. at 545, 105 S.Ct. at 1495; *Curry*, 843 F.Supp. at 992. For the same reason, Larsen was not entitled to cross-examine the witnesses testifying against him.

▅▅▅ In addition, Larsen claims procedural deficiencies in not being provided the opportunity to rebut or clarify the Senate committee's final report and call witnesses to testify in opposition to the findings contained therein. (Compl. ¶ 58(f).) He alleges that the final report was "misleading and did not

accurately or fully represent the facts produced at trial," *id.* ¶ 58(g), and that the final report failed to make explicit findings of credibility, *id.* 58(b). Larsen's claims fail, however, because due process required only that he be afforded the chance to rebut the *charges* against him. Furthermore, as he is not entitled to a full-blown evidentiary hearing, due process does not require the committee to make explicit factual findings underlying its conclusions. Larsen does not maintain that the Senate Defendants failed to notify him of the charges against him or offer him the opportunity to rebut these charges. He concedes that throughout the hearings he was·represented by counsel and that he was provided with the opportunity to present argument to the full Senate on his behalf. (Compl. ¶ 51.) Due process required nothing more.[20]

▅▅▅ Larsen also alleges that his due process rights were violated because the Senate decided his pretrial motions after the impeachment proceedings, and because the Senate Defendants denied his motion to continue the proceedings, thus depriving him of the opportunity to review all the evidence against him. (Compl.· ¶¶ 58(*l*), (m).) Due process, however, does not necessarily require advance notice to the employee of the employer's underlying reasons for terminating an employee possessing a constitutionally protected property interest in his job.[21] *Edmundson*, 4 F.3d at 193. Furthermore, as already noted, the constitution does not require that the employee be informed of *all* of the evidence against him, just that he must know the *substance* of the charges against him.[22] *McDaniels*, 59 F.3d at 454. Because

---

19. For the same reason, Larsen's claim that he was "denied the appearance of justice in that he was not informed at any time how the members of the Senate, other than members of the Committee, became acquainted with the evidence" also fails to allege a violation of due process. (Compl. ¶ 59.)

20. Larsen further alleges that his due process rights were violated in that the Senate found him guilty on article II yet acquitted him on article III. Article III accused Larsen of testifying falsely before the grand jury regarding the facts underlying the allegations contained in article II. Larsen does not proffer precisely what due process guarantees are violated by the Senate's al-

leged "inconsistent" findings and the court will dismiss this claim.

21. The court notes that even drawing all inferences from the complaint in favor of Larsen, he had access to the charges against him from at least May 18, 1994, the date on which the House of Representatives initially introduced the seven articles of impeachment. (Compl. ¶ 38.)

22. Larsen merely asserts that being unable to review the materials in and of itself violated his due process rights, without claiming any actual injury resulting, such as being unable to adequately rebut the charges against him.

Larsen does not claim that the Senate Defendants failed to inform him as to the nature of the charges against him—indeed, the articles of impeachment were a matter of public record—his allegations do not state a claim for a violation of due process.

 Larsen also asserts several claims in which he appears to attack the impartiality of the Senators, and by extension, the impeachment proceeding itself. Two of these allegations are easily disposed of. First, Larsen maintains that Senator Fumo appeared as a witness at the hearings and also participated in the proceedings as a member of the Senate, ultimately voting to convict. (Compl. ¶ 58(j).) Second, Larsen alleges that "[a]nother Senator who harbored ambitions of being a Pennsylvania Supreme Court Justice, served as a member of the Committee and voted to convict." (*Id.* ¶ 58(k).) The court does not read the case law delineating the due process protections afforded public employees as prohibiting either of these factual scenarios in the context of pretermination procedures. Furthermore, the votes of these two Senators were hardly dispositive in the final Senate vote of forty-four to five to convict Larsen on article II or the unanimous Senate vote to bar him from holding public office in the future. (*Id.* ¶ 52.)

 Larsen also alleges that "during the evidentiary hearings and closing arguments, [he] was precluded from establishing that adverse witnesses had ex-parte (sic) communications with members of the Senate and members of the Committee." (*Id.* ¶ 58(h).) Larsen does not claim that these alleged "ex parte" communications prohibited him from knowing the substance of the Senate's case against him, or that such communications resulted in a lack of impartiality by the Senate Defendants. Larsen's contention appears to be that the occurrence of such communications in and of itself violated his right to due process. The court finds that without more, the mere existence of communications between Senate members and witnesses out-side of Larsen's presence, even if true, would not amount to a violation of due process.

 Larsen alleges two procedural improprieties which if proven, may constitute a violation of due process under either the due process protections afforded a public employee possessing a property interest in his job or under the lesser protections governing the removal of public officers. Where an employee with a constitutionally protected property interest in his job receives only a pretermination proceeding, as opposed to a pretermination proceeding and posttermination process, due process requires that the pretermination decision-makers be impartial. *McDaniels,* 59 F.3d at 458–60. Larsen claims that he "was precluded from establishing the effect that Legislative Initiative Grants had on the proceedings, Senators and adverse witnesses. Such grants, known as 'walking around money,' or 'WAMS,' are highly sought after discretionary funds awarded directly by individual Senators to whomever they want and are used to maintain voting discipline among the other Senators." (Compl. ¶ 58(n).) Larsen also asserts that he "was precluded from establishing that adverse witnesses, their agents, or relatives had made financial contributions to certain members of the Senate, including Senators who sat on the Committee." (*Id.* ¶ 58(o).) Larsen might be able to prove facts which would show that due to the receipt of funds either in the form of WAMS or financial contributions, Senators were predisposed to vote to convict him on the articles of impeachment. Larsen's allegations regarding the WAMS and financial contributions to each Senator constitute allegations regarding the impartiality of the decision-makers in the impeachment process. If Larsen could prove facts supporting his claim, this *might* constitute a deprivation of due process and, therefore, dismissal of these allegation is inappropriate.[23]

In sum, the court finds that the majority of deficiencies in the impeachment process which Larsen claims constitute violations of

**23.** The court recognizes that should this case reach the discovery stage, discovery on these issues may require greater oversight by the court than exercised in most cases. Furthermore, Lar-sen will face a greater burden in demonstrating the viability of his claims regarding the WAMS and financial contributions at the summary judgment stage.

due process are not based on rights to which he is entitled under the due process clause of the Fourteenth Amendment. Although in the preceding discussion the court has relied on case law which delineates the due process protections afforded employees who possess property rights in their jobs, Larsen's interest in his position as a supreme court justice entitles him to less protections than the due process protections provided to public employees who may only be terminated for cause. Larsen did not have "tenure in the same sense as an ordinary public employee." *Sweeney,* 375 A.2d at 713. Nevertheless, even under the standards governing pretermination proceedings for employees possessing unqualified property rights in their job, the majority of Larsen's claims fail as a matter of law.[24]

■ Larsen also alleges that the Senate Defendants deprived him of his property right "in not being barred from holding office." (Compl. ¶ 55.) Larsen's allegation amounts to a claim that he possessed a property right to seek public office. In response to the Senate Defendants' motion to dismiss, Larsen points to no source of state law which would create such a legitimate claim of entitlement and the court finds that his claim is meritless. Accordingly, the court will grant the Senate Defendants' motion to dismiss with respect to this claim.[25]

■ It should be noted that the amended complaint does not specify whether Larsen is asserting a procedural or substantive due process claim. Both the Senate Defendants and Larsen address the arguments in their briefs only to the question of whether Larsen has stated a procedural due process

claim. In order to maintain a substantive due process claim, Larsen would need to have alleged that the Senate Defendants "deliberately and arbitrarily abused its power," *Independent Enterprises,* 103 F.3d at 1179 (internal quotations omitted). In impeaching him, a claim that appears no where in the amended complaint. Furthermore, the court's finding that his interest in his position as a supreme court justice is highly circumscribed would negate Larsen's ability to maintain any such cause of action. The Third Circuit has stated that "a substantive due process claim grounded in the arbitrary exercise of governmental authority may be maintained only where the plaintiff has been deprived of a 'particular quality of property interest.'" *Id.* (quoting *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 600 (3d Cir.1995). Beyond stating that the particular quality of property right to which substantive due process protections attach includes "fundamental property interests" the Third Circuit has not delineated precisely the types of interests which are protected. *Independent Enterprises,* 103 F.3d at 1179. Nevertheless, the court finds that Larsen's highly circumscribed interest in his position as an elected supreme court justice does not qualify as the type of fundamental property interest warranting substantive due process protection.

### (2) Deprivation of Liberty Interest

■ In addition to claiming that he possessed a property interest in his position as a supreme court justice, Larsen alleges that he possessed a liberty interest in his post as well.[26] He maintains that Defendants deprived him of his liberty interest without due

---

24. Although the court recognizes that federal law governs the determination of what process is due prior to the deprivation of a constitutionally protected property interest, it is worth noting that in *Sweeney,* the Pennsylvania Supreme Court held that "[g]iven the circumscribed nature of a legislator's private interest in his elected office and the overriding need for the Legislature to protect its integrity through the exercise of the expulsion power, it may be that the requirement of a two-thirds vote to expel *by itself satisfies procedural due process.*" 375 A.2d at 713 (emphasis added). In this case, Larsen was not only impeached by a two-thirds vote of the Senate, but was also afforded numerous procedural protections.

25. Larsen does not argue in his opposition brief that he possessed a property interest in having the right to seek public office and it appears that he has abandoned this claim to the extent the complaint can be read to assert such a claim.

26. Larsen also maintains that he possessed a liberty interest in not being barred from office. The court's finding that Larsen received all the process he was due in conjunction with Defendants' impeachment of him defeats this claim as well.

process of law in violation of the Fourteenth Amendment.

"The Supreme Court has held that a person has a liberty interest in employment actions which require due process 'where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him.'" *Homar v. Gilbert*, 89 F.3d 1009, 1022 (3d Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 678, 136 L.Ed.2d 604 (1997) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972)). The court is unaware of any other liberty interest claim that Larsen could pursue in the context of challenging the process afforded him in the impeachment proceedings. Thus, although Larsen's amended complaint is somewhat unartfully drafted, the court construes it as an attempt to allege the type of claim recognized by the Supreme Court in *Roth*. Larsen's allegation, however, must fail, for he fails to allege an essential element of a stigmatization claim. Larsen does not claim that the Senate Defendants' allegations against him were false and/or misleading. *Fraternal Order of Police Lodge No. 5*, 868 F.2d at 82. The court will, therefore, dismiss Larsen's claim that the Senate Defendants deprived him of a liberty interest in conjunction with its impeachment proceedings against him.

### (3) Sixth Amendment

■ Larsen claims that the Senate impeachment proceedings violated his rights to an impartial fact-finder, confront witnesses, and assistance of counsel and other "process due" pursuant to the Sixth Amendment. The Senate Defendants have moved to dismiss Larsen's Sixth Amendment claims on the basis that the Sixth Amendment does not apply to impeachment proceedings.

The court agrees. The Sixth Amendment by its terms applies only to "criminal prosecutions." U.S. Const. Amend. 6. The proceedings against Larsen cannot under any circumstances be classified as criminal proceedings, therefore, his Sixth Amendment claims must fail.[27]

### (4) First Amendment Retaliation

■ Larsen claims that the Senate Defendants violated his First Amendment rights in that their decision to proceed against him and to vote in favor of impeachment were motivated by his prior statements in his petitions for the disqualification and recusal of Justices Cappy and Zappala. The Senate Defendants argue that dismissal of this claim is proper because the Pennsylvania Constitution affords them no discretion in deciding whether to pursue impeachment proceeding.

The court agrees with the Senate Defendants that the Pennsylvania Constitution does not afford them the discretion to decline to conduct impeachment proceedings once the House of Representatives has voted. Article 6, Section 4 states that "[t]he House of Representatives shall have the sole power of impeachment." Pa. Const. art. 6, § 4. Thus, a plain reading of the constitution demonstrates that it is the House of Representatives alone which decides whether or not to impeach and institute proceedings against a public official. Once the House has acted to impeach, Article 6, Section 5 designates the Senate as the body which will conduct the impeachment trial. Pa. Const. art. 6, § 5. The constitution affords the Senate no authority to disregard a resolution of impeachment and decline to conduct an impeachment trial. Thus, the court will dismiss Larsen's claim that the Senate violated his First Amendment rights in deciding to conduct the impeachment trial against him.

The Senate Defendants also move to dismiss Larsen's claim that his prior statements were substantial factors motivating their decision to vote against him. Defendants opine that because the article of impeachment on which Larsen was found guilty does not re-

---

**27.** As already discussed, in *Nixon* the Supreme Court in dicta refused to find that the United States Constitution's mandate that the Senate "try" all impeachment proceedings required the Senate to conduct the proceedings in the nature of a judicial proceeding. 506 U.S. at 229–31,

113 S.Ct. at 735–37. The court stated that the Framers did not intend to impose upon the Senate additional limitations in the manner of conducting impeachment trials other than those listed in Article I, section 3, clause 6. *Id.* at 230, 113 S.Ct. at 736.

late to his prior protected statements,[28] he has failed to state a claim for retaliation under the First Amendment.

In order to state claim for retaliation in violation of the First Amendment, a plaintiff must first demonstrate that he engaged in protected activity. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). Next, a plaintiff must show that the activity or statements in question was a substantial or motivating factor in the government's alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). A defendant may defeat the plaintiff's claim by showing by a preponderance of the evidence that absent the protected activity, the plaintiff would have suffered the same adverse action. *Id.; Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995). Defendants' argument that in order to state a claim for First Amendment retaliation Larsen must show that the adverse action taken against him relates to his prior protected statements has no support in the case law outlining the elements Larsen must prove in order to succeed on his claims. Accordingly, Defendants' argument provides no basis upon which to dismiss Larsen's First Amendment claims.

### (5) Medical Insurance Benefits

■ In part III(a) of the amended complaint, Larsen asserts that the Supreme Court Defendants, the Administrative Office of the Courts, and Defendants Frankforter and Sobolevitch revoked his right to receive lifetime medical benefits in violation of his right to contract and his rights to due process and equal protection.

Larsen's claim regarding the discontinuation of his medical insurance benefits stems from Defendant Frankforter's June 17, 1994, notice to him, on behalf of all the Supreme Court Defendants, that as of June 3, 1994, he would no longer receive medical benefits pursuant to the Pennsylvania judiciary's "Fully State–Paid Basic and Specialized Coverage" insurance plan. Defendant Frankforter informed Larsen that Defendants were cancel-

ling his medical benefits based on a 1993 amendment to Article 5, Section 16 of the Pennsylvania Constitution. The relevant portion of Article 5, Section 16 reads:

> Except as provided by law, no salary, retirement benefit or other compensation, present or deferred, shall be paid to any justice, judge or justice of the peace who, under section 18 or under Article VI, is suspended, removed or barred from holding judicial office for conviction of a felony or misconduct in office or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute.

Pa. Const. art. 5, § 16(b). Larsen claims that at the time the Supreme Court Defendants revoked his medical benefits, his right to receive such benefits had already vested.

Larsen alleges that in January 1974, when he initially became a member of the Pennsylvania judiciary, one of the terms and conditions of his service was a medical plan that provided lifetime medical benefits for members of the judiciary with twenty or more years of service, regardless of age. On or about December 12, 1989, the Pennsylvania Supreme Court adopted a new medical insurance plan which provided lifetime medical benefits for members of the judiciary with ten or more years of service, regardless of age. As of December 12, 1989, Larsen had served as a member of the Pennsylvania judiciary for more than ten years. Larsen argues that as a result of his ten years of service, his right to receive lifetime medical benefits upon separation from the judiciary vested on December 12, 1989. Defendants' revocation of his benefits, Larsen contends, violates the impairment of contracts clause of the United States Constitution and his rights to due process and equal protection.

In support of their motion to dismiss Larsen's impairment of contract claim, Defendants argue that in so far as the amended complaint alleges that on December 12, 1989 the Supreme Court "adopted a new medical insurance plan for *retired* members of the

---

**28.** The Senate Defendants do not challenge Larsen's claim that his statement in the petitions for disqualification and recusal are protected under the First Amendment and, thus, the court makes no finding in this regard in the instant memorandum.

state judiciary," Larsen's claim fails because the amended complaint on its face demonstrates that the medical plan applied only to retired members of the judiciary. (Compl. ¶ 108, emphasis added.) Since Larsen was removed from office pursuant to the sentence imposed as a result of his criminal conviction, removed pursuant to the CJD's interim order and impeached, under the terms of the plan he was not entitled to receive lifetime medical benefits.

Defendants' argument fails. First, a determination of whether or not the terms of the medical insurance plan exclude Larsen as a potential beneficiary is not a question properly resolved on a motion to dismiss. The plan itself is not before the court. Larsen has alleged that he was covered by the terms of the plan and at the motion to dismiss stage the court is required to accept as true all factual allegations in the amended complaint.

Second, the Supreme Court Defendants did not cite the terms of the plan as the basis upon which they were relying in revoking Larsen's lifetime medical benefits. Defendant Frankforter cited Article 5, Section 16 of the Pennsylvania Constitution. Thus, in evaluating whether Larsen has stated a claim for impairment of contract, the court is required to determine whether Defendants' proffered reasons provide a legitimate basis upon which to cancel Larsen's medical insurance.

The court finds that Larsen has alleged sufficient facts in the amended complaint to support a claim for impairment of contract under the federal constitution. The court's decision is based on prior decisions of the Pennsylvania Supreme Court.

The question of whether or not the Supreme Court Defendants may properly rely upon the newly enacted provision of Article 5, Section 16 of the Pennsylvania Constitution depends upon whether or not prior to its enactment, Larsen possessed a vested right to receive lifetime medical benefits upon his separation from the judiciary. In Pennsylvania, the law is well-settled that where a public employee's right to receive benefits has vested, any attempt to later interfere with that right constitutes an unconstitutional impairment of contract. *Association of Pa.*

*State College and Univ. Faculties v. State System of Higher Educ.,* 505 Pa. 369, 479 A.2d 962, 965 (1984) (citing cases); *Miller v. Commonwealth, State Employees' Retirement Bd.,* 498 Pa. 103, 445 A.2d 88, 89 (1981). This principle is based on Pennsylvania's long-standing recognition that the right to receive retirement benefits is contractual because "retirement provisions for public employees is that of deferred compensation for service actually rendered in the past." *Commonwealth ex rel. Zimmerman v. Officers and Employees Retirement Bd.,* 503 Pa. 219, 469 A.2d 141, 142–43 (1983). Vesting of public retirement benefits usually occurs when the employee, "having made all required contributions, has completed the number of years of service required for eligibility." *Police Pension Fund Ass'n Bd. v. Hess,* 127 Pa.Cmwlth. 498, 562 A.2d 391, 395 (1989).

The issue of law that appears unsettled in Pennsylvania is whether the right to receive medical insurance benefits is a form of deferred compensation which, upon vesting, gives rise to unalterable contractual rights. Although several lower courts in Pennsylvania have held that medical insurance benefits are a form of deferred compensation, the Pennsylvania Supreme Court has never directly addressed the issue. *See City of Chester v. Fraternal Order of Police,* 150 Pa. Cmwlth. 235, 615 A.2d 893, 898–99 (1992) (medical insurance benefits form of deferred compensation for past services rendered); *Newport Township v. Margalis,* 110 Pa. Cmwlth. 611, 532 A.2d 1263, 1265–66 (1987) (applying theory of deferred compensation to medical insurance benefits); *Township of Tinicum v. Fife,* 95 Pa.Cmwlth. 516, 505 A.2d 1116, 1119–1120 (1986) (medical benefits as form of deferred compensation reflecting contractual rights); *see also Turley v. John Hancock Mutual Life Ins. Co.,* 315 Pa. 245, 173 A. 163, 165 (1934) (recognizing vesting of employee's right to receive medical benefits without discussing whether benefits form of deferred compensation).

The court's review of the relevant case law reveals only three opinions by the Pennsylvania Supreme Court in which it has indirectly addressed the question of whether medical insurance benefits are a form of deferred

compensation which, upon vesting, may not be altered retroactively. In *Lower Merion Fraternal Order of Police Lodge No. 28 v. Lower Merion Township*, the court addressed the question of whether an arbitrator's termination of post-retirement medical benefits to former township employees required the township to violate the First Class Township Act by requiring it to provide health coverage after retirement. 511 Pa. 186, 512 A.2d 612, 615 (1986).[29] Three members of the court interpreted the Act as prohibiting Lower Merion from contracting to provide insurance coverage to anyone who was not a township employee and vacated the arbitrator's award on that basis. *Id.* (Zappala, J. and Flaherty, J. with Nix, C.J. concurring). However, in an opinion authored by former Justice Larsen and joined by former Justices Hutchinson and Papadakos, Larsen expressed the belief that post-retirement medical benefits are a form of deferred compensation "for the compensation foregone during active employment in exchange for benefits and security upon retirement." *Id.* 512 A.2d at 619.

The second case in which the Pennsylvania Supreme Court has commented on the issue of whether medical insurance benefits are a form of deferred compensation is *In re Appeal of Upper Providence Police Delaware County Lodge No. 27 Fraternal Order of Police*, 514 Pa. 501, 526 A.2d 315 (1987). The issue in *Upper Providence* was whether in directing the elimination of post-retirement hospital and medical benefits the arbitrator had exceeded his power. The Home Rule Act prohibits municipalities from diminishing former municipal employees' entitlement to benefits. *Id.* 526 A.2d at 322. In dicta, the supreme court noted that "[w]hile the [appellant] did not initially challenge the arbitration award on constitutional grounds, elimination of these benefits ... would also pose serious constitutional problems." *Id.* at 322 n. 6. In support of this statement, the court cited to two of its prior opinions holding that

amendments to the Commonwealth's retirement system impermissibly impaired employees' contract rights based on the fact that retirement benefits are a form of deferred compensation. *Id.* (citing *Association of Pa. State College and Univ. Faculties, v. State System of Higher Education*, 505 Pa. 369, 479 A.2d 962 (1984); *Catania v. Commonwealth, State Employees' Retirement Bd.*, 498 Pa. 684, 450 A.2d 1342 (1982)). Former Justice Larsen authored the supreme court's opinion in *Upper Providence* and was joined by former Chief Justice Nix, former Justices McDermott, Hutchinson, Papadakos and present Chief Justice Flaherty and present Justice Zappala.

The third case in which the Pennsylvania Supreme Court indirectly addressed the issue of whether medical insurance benefits are a form of deferred compensation is *Shiomos v. Commonwealth, State Employees' Retirement Bd.*, 533 Pa. 588, 626 A.2d 158 (1993). The issue in *Shiomos* was whether the Public Employee Pension Forfeiture Act as applied to former Court of Common Pleas Judge Shiomos constituted an unconstitutional impairment of contract under Article 1, Section 17 of the Pennsylvania Constitution. Enacted on July 8, 1989, the Forfeiture Act prohibits the payment of pension benefits to public employees convicted of any one of the crimes enumerated in the Act. Shiomos's entitlement to receive retirement benefits vested on July 30, 1979, when he was credited with the necessary ten years of service on the bench. Shiomos argued that since his right to receive his pension had vested prior to the commission of the criminal acts underlying his conviction, revoking his retirement benefits constituted an impermissible impairment of his right to contract.

The supreme court agreed that had Shiomos retired at the end of his term in 1982 without assuming any additional public service duties "his pension contract would not be subject to the forfeiture provisions of [the Act], even though the Act was enacted before

**29.** Aside from citing to *Lower Merion* as a means of illustrating the supreme court's view on the issue of whether Pennsylvania law recognizes medical insurance benefits as a form of deferred compensation, the precedential value of the equally divided court's opinion is questionable given the court's later dismissal of the appeal on reargument as "having been improvidently granted." *Lower Merion Fraternal Order of Police Lodge No. 28 v. Township of Lower Merion*, 518 Pa. 118, 541 A.2d 738 (1988). The court did not, however, rescind its prior opinion.

his right to receive his pension had vested." *Id.* 626 A.2d at 162. Shiomos had, however, assumed a second term of office after the enactment of the Act and, thus, took office for a second time subject to the terms of the Act and its applicability to public employees like himself. The court stated "whether or not a public employee's right to receive retirement benefits has vested, or he or she is in actual receipt of benefits, all previous accumulated rights to receive such benefits are subject to forfeiture by and through the renewed agreement which is formed each time a person chooses to become a public official as defined by [the Act]." *Id.* at 162–63. Justice Cappy authored the supreme court's opinion in *Shiomos,* joined by present Chief Justice Flaherty and present Justice Zappala, and former Chief Justice Nix.

An issue not before the supreme court in *Shiomos,* but one that Shiomos had argued before the commonwealth court, was the legality of the Administrative Office of the Court's termination of Shiomos's medical coverage. On appeal, Shiomos only presented argument regarding the commonwealth court's order affirming the revocation of his right to receive his pension. The supreme court noted, however, that "[our] opinion shall only address the issues raised in [the case dealing with Shiomos's pension rights] as we agree with appellant's position that our decision in this case is dispositive of the issues in the companion appeals." *Id.* at 626 A.2d at 159 n. 4. Additionally, in noting the date on which Shiomos's pension would be forfeited, the court stated "the medical benefits of appellant Shiomos … would also be forfeited." *Id.* at 160 n. 7.

In the absence of a clear statement by Pennsylvania's highest court holding that the right to receive medical insurance benefits is a form of deferred compensation, this court is required to predict how it would rule. *Rabatin v. Columbus Lines, Inc.,* 790 F.2d 22, 24 (3d Cir.1986). In reaching its conclusion, it is proper for the court to follow the decisions of intermediate state courts unless "other persuasive data" indicate that the

Pennsylvania Supreme Court would rule differently. *Fisher v. USAA Casualty Ins. Co.,* 973 F.2d 1103, 1105 (3d Cir.1992) (quoting *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)). The decisions of lower Pennsylvania state courts are "indicia" of how the Pennsylvania Supreme Court would rule on the issue presently before this court. *McGowan v. Univ. of Scranton,* 759 F.2d 287, 291 (3d Cir.1985) (quoting *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981)).

■ The court predicts that the Pennsylvania Supreme Court would hold that under the appropriate circumstances medical benefits may be a form of deferred compensation. Although not having had the occasion to squarely address the issue, the supreme court has implicitly suggested that medical benefits are a form of deferred compensation. In the instant case, assuming the veracity of the facts alleged in the complaint, Justice Larsen may ultimately be able to prove that his right to receive such benefits vested on December 12, 1989 and that Defendants' retroactive application of the 1993 amendment to Article 5, Section 16 impermissibly impaired his right to contract. Therefore, dismissal of Larsen's impairment of contract claims at this stage in the proceeding is inappropriate.

■ In addition, dismissal of Larsen's due process claim relating to the revocation of his medical insurance benefits is also improper. In support of dismissal, Defendants argue that Larsen did not have a contractual right to continue to receive state-paid medical insurance benefits. As the court has found that under Pennsylvania law, under the appropriate circumstances, medical benefits are a form of deferred compensation and that Larsen may be able to prove that his right to receive such compensation vested on December 12, 1989, Defendants' argument provides no basis upon which to dismiss Larsen's due process claim.[30]

---

30. Defendants also argue for dismissal of Larsen's due process claims based on the fact that he received all process he was due in his impeachment proceeding before the Senate, his

criminal conviction, and his hearing before the CJD. Defendants' argument has no merit as none of these proceedings addressed the issue of

■ Defendants also move to dismiss Larsen's claim that Defendants have deprived him of equal protection of the laws in that other judges who qualified for lifetime benefits who were later removed from office under circumstances similar to his own continue to receive state-paid medical benefits. In support of dismissal, Defendants maintain that Larsen has failed to allege membership in a protected class which would afford him protection under the equal protection clause. The equal protection clause does not, however, prohibit only governmental actions that differentiate between "suspect" or "quasi-suspect" classes of individuals. Whether or not a plaintiff is a member of a suspect class determines the appropriate standard to be applied in evaluating the legitimacy of the state's actions. *See Envirotech Sanitary Systems, Inc. v. Shoener*, 745 F.Supp. 271, 280 n. 11 (M.D.Pa.1990) (Conaboy, J.). Lack of membership in a protected class does not, however, relieve the government of the obligation to act reasonably in differentiating between groups of similarly situated individuals. Thus, since Larsen's equal protection claim involves neither the deprivation of a fundamental right nor discrimination based on a suspect classification, the court will ultimately evaluate his claims under the rational relationship test. *Palmer by Palmer v. Merluzzi*, 868 F.2d 90, 96 (3d Cir.1989). Determination of whether Defendants acted reasonably in depriving Larsen of his right to receive lifetime medical benefits as compared with other similarly situated individuals is inappropriate at this stage in the litigation and Defendants' motion to dismiss this claim will be denied.[31]

### (6) PHSA Claims

In parts III(b) and (c) of the amended complaint, Larsen asserts that the Supreme Court Defendants, Defendant Administrative Office of the Courts, and Defendants Sobolevitch and Frankforter have denied him benefits under the Public Health Services Act ("PHSA"), 42 U.S.C. §§ 201 *et seq.*, 42 U.S.C. §§ 300bb–1 *et seq.* 42 U.S.C. § 300bb–2(2) of the PHSA requires state and local government group health plans to provide continuation coverage for eighteen months to certain individuals upon termination of their employment. Such coverage must consist of coverage identical to the coverage provided under the group health plan to current employees. Larsen claims that Defendants have wrongfully denied him coverage pursuant to section 300bb–2(2) and that their decision to do so was unconstitutionally motivated by his prior statements regarding Justices Cappy, Zappala, and Chief Justice Nix. Defendants argue that Larsen was removed from office based on "gross misconduct," an express exception to the PHSA's requirement that state and local governments permit employees to pay a premium and participate in group health insurance for eighteen months after termination. 42 U.S.C. § 300bb–3(2). Furthermore, Defendants argue that even if Larsen prevailed on his section 300bb–1 claim, his claims are moot because the Eleventh Amendment prohibits the court from granting Larsen anything other than preliminary injunctive relief. Defendants opine that this would be outside the court's powers since any entitlement Larsen may have had to continued health care coverage would have expired on November 3, 1995.

In response, Larsen argues that he was not convicted for conduct relating to his position as a supreme court justice and, there-

---

the termination of Larsen's medical insurance benefits.

**31.** The individual Supreme Court Defendants, the Administrative Office of the Pennsylvania Courts and Defendants Sobolevitch and Frankforter also argue that dismissal of Larsen's claims against them is proper based on the doctrine of qualified immunity. The court will not consider the arguments of the Supreme Court Defendants to the extent that they relate to claims which, pursuant to *Younger v. Harris*, the court will dismiss. Furthermore, the AO and Defendants Sobolevitch and Frankforter's argu-

ments in support of qualified immunity are limited to the same arguments they assert in support of the outright dismissal of Larsen's claims. As the court has determined that these arguments provide no basis upon which to dismiss Larsen's impairment of contract, due process and equal protection claims, they also provide no basis upon which to afford Defendants immunity from suit in their personal capacities. Defendants will be free to renew their arguments at the summary judgment stage based on the relevant legal principles of law as discussed in this memorandum.

fore, his case is distinguishable from the cases cited by Defendants in support of dismissal.[32] *See Burke v. American Stores Employee Benefit Plan,* 818 F.Supp. 1131 (N.D.Ill.1993) (employee's termination for improper use of promotional materials constitutes gross misconduct and COBRA's provisions not triggered); *Adkins v. United Int'l Investigative Services, Inc.,* No. C:91–0087 BAC, 1993 WL 345186 (N.D.Cal. March 27, 1993) (security guard's termination of employment for leaving post while on duty constituted gross misconduct under COBRA); *Karby v. Standard Products Co.,* NO. 3:90–2918–17, 1992 WL 333931 (D.S.C. June 22, 1992) (employee's false statements on conflict of interest disclosure form and theft of company property constitutes gross misconduct); *Avina v. Texas Pig Stands, Inc.,* No. SA–88–CA–13, 1991 WL 458848 (W.D.Tex. Feb. 1, 1991) (employee's termination for irregularities in handling cash, invoice irregularities and failure to improve performance of one of defendant's stores constitutes gross misconduct).

The court is not prepared at this juncture to make a definitive determination as to whether Larsen's convictions constitute gross misconduct within the meaning of section 300bb–3(2), although it is likely that the court will ultimately conclude that this is so. The relevant question in determining whether Larsen committed gross misconduct is not merely whether he abused his position as a supreme court justice, but whether he committed acts of misconduct as an employee of the Commonwealth generally. Larsen was convicted on two counts of conspiracy to obtain possession of controlled substances. In order to effectuate his crimes, he directed his staff employees to secure prescription drugs in their names and had them pay for the prescriptions using their National Prescription Administrators ("NPA") cards. NPA "is a drug benefit program administered by the NPA on behalf of the state judiciary for its employees." *Commonwealth v. Larsen,* 682 A.2d at 786 n. 2. Had Larsen carried out his unlawful acts without the assistance of state employees under his employ or the judiciary's benefit program, the court might be more likely, once it reached the issue, to conclude that his criminal activity was unrelated to his employment.[33]

The court need not, however, decide this issue at the present time for two reasons. First, if Larsen succeeds on his claim that Defendants have improperly revoked his right to receive lifetime medical benefits his PHSA claim will become moot. Second, the Senate impeached Larsen for improper ex parte communication with an attorney who had cases pending before the supreme court. This offense clearly constitutes gross misconduct relating to his employment and his position as a supreme court justice. If Larsen is unsuccessful on his claims that the Senate Defendants committed constitutional errors in the impeachment process, the impeachment verdict will stand. This would provide an independent basis for finding that Larsen is ineligible for PHSA continuation coverage and would moot his claims.[34]

32. The cases cited by Defendants were all decided pursuant to the Consolidated Omnibus Budget Reconciliation Act or "COBRA" which is virtually a mirror image of the PHSA only it applies to private employers. 29 U.S.C. §§ 1161–68. Thus, cases interpreting the term "gross misconduct" under COBRA are appropriately used in interpreting the same term as it is used in the PHSA.

33. At trial, at least two of Larsen's staff members testified that they carried out his requests in part because he was "the boss" and they felt they had no choice. *Commonwealth v. Larsen,* 682 A.2d at 786 n. 4.

34. Because the court finds that Larsen's PHSA claims may be moot depending upon the outcome of other issues in the case, the court will not address the issue of whether he has stated a claim for First Amendment retaliation in the denial of continuation coverage under the PHSA.

Defendants also argue that Larsen's PHSA claims should be dismissed because the eighteen month continuation period has expired and the Eleventh Amendment prohibits the court from granting him retroactive monetary relief. The court does not agree that the expiration of the eighteen month period deprives it of authority to grant relief in this case. If this were true and the court were prohibited from granting equitable relief beyond the statutorily proscribed eighteen month limit, courts would be extremely limited in the relief they could afford under the PHSA. In addition, section 300bb–7 explicitly authorizes potential plaintiffs to "bring ... action[s] for appropriate equitable relief." 42 U.S.C. § 300bb–7.

### H. Senate Defendants' Motion Pursuant to Rule 41(d)

 The Senate Defendants have moved to recover the costs of Larsen's previously dismissed commonwealth court action pursuant to Federal Rule of Civil Procedure 41(d). Rule 41(d) states:

> If a plaintiff who has once dismissed an action in any court commences an action based upon, or including the same claim against the same defendants, the court may make such order for the payment of the action previously dismissed as it may deem proper and may stay the proceedings in the action until the plaintiff has complied with the order.

Fed.R.Civ.P. 41(d). The decision whether to stay an action and impose costs pursuant to Rule 41(d) is within the broad discretion of the trial court. 5 Moore's Federal Practice ¶ 41.16 at 41–185 (2d ed. 1996) (citing cases). "The purpose of the rule is to prevent the maintenance of vexatious law suits and to secure, where such suits are shown to have been brought repetitively, payment of costs of prior instances of such vexatious conduct." *United Transp. Union v. Maine Central R.R. Co.*, 107 F.R.D. 391, 392 (D.Me.1985).

The court will deny Defendants' motion. Although several of the claims Larsen asserts in the present action are similar to ones he raised before the commonwealth court, the two cases are hardly identical. As the court has already noted in its discussion regarding the applicability of the *Rooker–Feldman* doctrine, many of the claims that Larsen raises in the instant case are ones that arose out of the impeachment proceedings and, therefore, could not have been raised at the time he filed suit in commonwealth court. Additionally, in the commonwealth court action, Larsen sought primarily preliminary injunctive relief. Here, he seeks permanent injunctive relief after a full hearing on the merits of his amended complaint. *See United Transp. Union*, 107 F.R.D. at 393. Also, given the fact that the political question doctrine may have prohibited Larsen from asserting many of his claims against the Senate Defendants in state court, the court does not find his decision to file suit in federal court unreasonable or "motivated by any improper purpose." *Id.*

### I. Senate Defendants' Motion to Strike Portions of the Amended Complaint

 Pursuant to Federal Rule of Civil Procedure 12(f), the Senate Defendants argue that the court should dismiss paragraphs twenty-two, twenty-five, thirty-five, sixty, and sixty-one of the amended complaint. Rule 12(f) permits the court to strike "any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). The paragraphs Defendants move to strike address the allegations made by Larsen in his petitions for disqualification and recusal regarding Justices Zappala and Cappy and Chief Justice Nix.

It is within the court's discretion to strike portions of the complaint which technically fall within the ambit of Rule 12(f). *North Penn Transfer, Inc. v. Victaulic Co. of America*, 859 F.Supp. 154, 158 (E.D.Pa.1994). "Motions to strike ... are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Id.* (internal quotations omitted).

The allegations contained in the paragraphs which Defendants move to strike relate to Larsen's First Amendment claims against the Senate Defendants which the court has declined to dismiss. These portions of the amended complaint allege facts which address the nature and substance of Larsen's allegations regarding various justices of the Pennsylvania Supreme Court, thus supporting his claim that these statements are entitled to First Amendment protection. Furthermore, the facts alleged in these paragraphs are matters of public record. Accordingly, the court does not find that Defendants will be prejudiced by their inclusion in the amended complaint. The court will deny the motion to strike.

### J. JCB Defendants' Motion for Sanctions

The JCB has moved for the imposition of sanctions pursuant to Rule 11 against Larsen and his counsel. The underlying premise

upon which the JCB Defendants base their motion, is the frivolity of Larsen's claims against them. The court, however, will abstain from hearing these claims and makes no finding as to the meritoriousness of Larsen's allegations against the JCB. As presented to the court, the JCB Defendants' motion would require the court to address the merits of Larsen's claims. Such an undertaking would be inappropriate in light of the court's decision to abstain. Moreover, the court does not find that its decision to abstain indicates such frivolity on Larsen's or his counsel's behalf in filing suit in federal court to warrant the imposition of sanctions in this case. The JCB Defendants are not prohibited from renewing their motion at a later stage in the proceeding.

## IV. *Conclusion*

The court will enter an order in accordance with the foregoing discussion.